20 A.3d 402

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
GEORGE CALLEIA, DEFENDANT–RESPONDENT.

Argued March 15, 2011—Decided June 9, 2011.

276

*Frank J. Ducoat,* Deputy Attorney General, argued the cause for appellant (*Paula T. Dow,* Attorney General of New Jersey, attorney).

*Edward C. Bertucio* argued the cause for respondent (*Hobbie, Corrigan, Bertucio & Tashjy,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

Defendant George Calleia was convicted by a Monmouth County jury of the murder of his wife, Susan, tampering with evidence, and hindering apprehension. *See N.J.S.A.* 2C:11–3(a)(2) (first-degree murder); *N.J.S.A.* 2C:28–6 (tampering with physical evidence); *N.J.S.A.* 2C:29–3(b)(4) (hindering apprehension). He was sentenced to an aggregate term of fifty years in prison, subject to

the mandatory eighty-five percent period of parole ineligibility imposed by the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2. In this appeal by the State, we consider whether defendant's convictions appropriately were reversed by the Appellate Division because the deceased victim's hearsay statements regarding her state of mind were used as evidence suggestive of defendant's motive.

## I.

### A.

The State's petition for certification, which we granted, 204 *N.J.* 41, 6 *A.*3d 443 (2010), argues that the victim's hearsay statements were admissible to show the relationship between the parties and to explain a motive for defendant's alleged criminal conduct, namely that because the victim intended to divorce defendant, and because defendant became aware of the victim's plan, he killed her. Defendant's position is, essentially, that a decedent's hearsay statements are inadmissible to prove defendant's motivation or conduct. Regardless of the outcome of that difference as to the hearsay evidence, the State further maintains that even if the victim's hearsay statements were improperly admitted, any error was harmless because non-hearsay evidence established the same essential facts of the State's motive theory, because of the overwhelming evidence of defendant's guilt, and because of the curative effects of the trial court's jury instructions regarding use of the decedent's statements.

Context is important for the parties' pitched battle over the appropriateness of the hearsay statements concerning the deceased victim's state of mind admitted in defendant's trial. Here, the State's case was built on circumstantial evidence, as the following basic information was all that the murder investigation initially revealed.

The day after defendant reported her missing, Susan Calleia's body was found wrapped in a yoga mat in the cargo area of the

family's Lexus SUV. The vehicle was parked at the PNC Arts Center, about two miles from the family's home. She had been strangled to death by hand, but had sustained such severe bruising and trauma to her head and body that, absent the strangulation, she still might have died. Aside from her socks, she was naked from the waist down. Her body was positioned in such a way that was consistent with sexual assault. Susan's pants and vaginal swabs both tested negative for sperm and semen, but forensic experts agreed that intercourse can occur without leaving sperm or semen on the female.

Also, the vehicle's distance from the home was the subject of close examination, specifically in respect of the amount of time it would take to travel from the family home to where the SUV was found. Travel estimates for that distance varied. Direct routes ranged from 1.5 miles, for a straight-line route without regard to terrain, to 2.4 miles. The travel time for someone on foot to move between the two locations factored into the State's ability to focus suspicion on defendant as the likely murderer with opportunity to carry it out. At trial, the parties explored when defendant was observed in his home the evening Susan disappeared, and the time when he reported Susan missing early the next morning and police officers arrived at the family home to speak with him about her disappearance. It was also brought out at trial that the location where the SUV was found was familiar to defendant because he parked at the PNC Arts Center and commuted to work by bus from there.

With that background in mind, we turn to the evidence that was presented during the trial about the victim and defendant, their relationship, the State's motive theory, and the quantum of evidence adduced against defendant. Because much of the State's case pivoted off defendant's statements, we address them in detail.

## B.

As of October 2005, when the murder occurred, defendant and Susan had been married for thirteen years and had an eight-year-

old daughter, whom we will call "Ana" for purposes of our discussion. Susan was described as a "stay-at-home mom" who was active in her daughter's social and academic life. As will be developed in further detail, in the months preceding Susan's murder, she made several statements and took various steps indicating that she intended to obtain a divorce from defendant. That said, we first set forth the events that, according to testimony, occurred the evening that Susan disappeared and the next morning when defendant reported her missing. Included in this recitation are defendant's statements to the police.

On Thursday, October 20, 2005, defendant returned home at about 6:30 p.m., as Susan was on her way out. He became upset when she would not tell him where she was going. She returned home that evening at about 8:10 p.m. When she still refused to say where she had been, the two began to argue. A neighbor, Marilyn Baxter, was leaving her home at about 8:15 p.m. when she heard what she described as "blood-curdling" screams—that she recognized as Susan's voice—coming from the Calleia residence. The couple's daughter, who had been in bed, came downstairs because she heard her mother screaming. Ana observed her parents go into the garage. She peeked in to watch them and believed she saw her father was trying to calm her mother down by putting his arms around her shoulders; their loud voices and the screaming continued. When Ana asked her parents what they were doing, her father, in what she described as a "normal" voice, told her to go back to bed. Unlike their routine, Ana's mother never came upstairs to tuck her in before Ana went to sleep that night.

According to defendant's statements to the police, the couple resolved their argument, and defendant went to bed between 9:00 and 9:30 p.m. Due to the couple's marital differences, they were sleeping in separate bedrooms, so he claimed that it was not until he was leaving for work the next morning at 5:30 a.m. that he noticed that Susan's car was missing. Unable to find his wife in the home, he called 9–1–1 to report her as missing.

Patrolman David D'Arcy of the Holmdel Police Department responded to the call. He arrived at the Calleia residence and asked defendant, when he opened the door, what was going on. Defendant remained silent and merely motioned the officer to enter the home. Defendant told D'Arcy that his wife was gone and explained that she had gone out the previous night without telling him where she was going. He said that he watched television while he waited for her to return. When Susan returned around 8:00 p.m., defendant admitted that they argued but he said that they resolved the issue and he went to bed. According to D'Arcy, defendant's demeanor during this encounter was "very nervous"; he was trembling and he spoke in a subdued tone.

Later that day, at approximately 3:45 p.m., Detective–Sergeant Brian Veprek and Detective Douglas Johnson went to the Calleia residence. Veprek testified that when he went to shake defendant's hand, defendant did not extend his hand in return; instead, he kept his hands covered by a long-sleeved white shirt that hung below his fingertips. Veprek also noted that defendant continually looked down and would not make eye contact.

Veprek asked defendant to go to the police station and give a formal statement. Defendant asked if that was necessary since it was "just a missing person's [sic] investigation." He also stated, "I'm not going to your house, I've seen Law and Order and NYPD Blue, and I know what happens when I'm in your house." However, when Veprek asked defendant if he would be willing to give a statement if a secretary came to his home, defendant agreed.

In his statement, defendant explained that he had called his wife's cell phone two or three times early in the afternoon the day she had gone missing. When asked why he did not call his wife's cell phone before calling 9–1–1, defendant responded that he was "in shock that she wasn't there and [he] just thought that if she wasn't there it can't be good." During the interview, defendant described his relationship with his wife as "cordial" and "friendly," but he said his marriage was "strained" and that he and his wife were not "as close as [they] used to be." He also said that they

had been sleeping in separate beds for about a month. When asked whether his wife had ever asked him for a separation or divorce, defendant responded, "She says she needs her space. Those are her words, never said separated or divorce." When asked whether he or his wife had seen or consulted with an attorney, he said, "I haven't, my wife said she wanted to speak to somebody just to find out any implications about buying another house." With respect to their daughter, defendant indicated that they had discussed a joint custody arrangement. Defendant also stated that "[f]or the past couple [of] weeks things have been getting nice again" and that "[u]p until about a month ago I thought everything was good."

Throughout the interview, defendant kept his right hand below the kitchen table. He received three phone calls from his brother, Eric, which he answered with his left hand. When the interview ended and defendant was handed a printed copy of his statement for review, he took the paper off the table with his left hand and reviewed it under the table. The detectives could see his upper right arm moving as he wrote on the statement with his right hand. He initialed some of the pages but refused to sign the statement or to initial the rest of the pages and instead wrote, "I'm not [ ] signing all of the pages or the end without an attorney present."

As the detectives were leaving his home, defendant spontaneously said, "I think my wife was abducted at 5:30 this morning while going to Welsh Farms to get milk." When asked why he had not mentioned this during the interview, defendant responded that he "did not think it was important." According to Veprek, defendant then asked how they "were making out" on the burglaries that had occurred on Goldsmith Drive. Defendant also stated that during the summer, someone had tried to break into his house and perhaps Susan's disappearance was related to that event.

Officers Veprek and Smythe returned to the Calleia residence at 3:20 the next morning with a warrant to search the premises.

Defendant, wearing the same long-sleeved white shirt that he wore during the previous day's interview, opened the front door for Veprek, kept his hands in his pockets, and asked, "Can't this wait until tomorrow afternoon?" When Veprek said that it could not wait, defendant dropped his head and stared at the ground.

At approximately 4:15 a.m., while the search was underway, defendant asked for permission to obtain a change of clothes from his closet. Veprek retrieved the clothes, and when defendant reached for them, Veprek and Smythe saw his right hand for the first time. They noticed defendant's right hand was swollen and had a laceration on one finger. When asked what had happened, defendant replied that he punched a wall in his house. Smythe asked where the wall was so that the forensic team could video-tape and photograph it. Defendant "[f]or the first time ... looked up and he stared at [us] for a good five seconds.... Then he looked back down at the ground." Smythe commented further that the injury "looked like it was from someone's teeth." Defendant then said:

> I want to recant what I just told you.... I backhanded Susan in the face on Thursday night in the garage. That is why she left the residence and did not return.... I want to recant that.... I went to hug Susan, and she bit me on the hand.

When asked why, if Susan bit him, there was only one set of teeth marks as opposed to two from the upper and lower set of teeth, defendant put his head down, looked to the ground, and did not respond.

During that same Saturday morning, Susan's car was found with a flat tire in a remote area of the PNC Arts Center in Holmdel. Frederick Baxter testified that defendant would regularly park at the PNC Arts Center and commute to work by bus from there. The car's doors were locked and the keys were inside but not in the ignition. Susan's partially dressed body was in the cargo area of the vehicle, wrapped in a yoga mat. She had extensive bruising and trauma to her face, and blood under her head. Clippings taken from her fingernails established that DNA

under her nails belonged to a male and that defendant could not be excluded as the source.

Dr. Frederick DiCarlo, an assistant medical examiner, performed the autopsy and opined that, although Susan suffered blunt force trauma, the immediate cause of her death was manual strangulation. Dr. DiCarlo testified that it takes two to three minutes to strangle someone, but he admitted on cross-examination that it is possible to strangle someone in under a minute, though not in ten to twenty seconds. Dr. DiCarlo estimated her time of death as between 4:00 p.m. and midnight on Thursday, October 20.

Dr. Mark Taff, a defense expert, estimated that Susan died no earlier than 7:00 or 8:00 a.m. the morning of Friday, October 21. He also stated that the use of a chokehold on Susan, a very petite woman, could cause death in as few as ten to twenty seconds. He concurred with Dr. DiCarlo insofar as agreeing that asphyxiation was the cause of death, but estimated that it was likely caused within sixty seconds. He agreed with Dr. DiCarlo's opinion that strangulation can take two to three minutes, but only if the pressure were applied intermittently to Susan's neck.[1]

## C.

As a part of its case against defendant, the State sought to introduce statements made by the victim to the effect that she was unhappy in her marriage, that she wanted a divorce, and that she was seeking the assistance of lawyers. On the day before trial, defendant made a motion in limine to exclude the victim's statements. The court denied the motion, ruling that the following categories of hearsay statements by Susan were admissible under *N.J.R.E.* 803(c)(3) as evidence of the victim's state of mind to show

---

[1] Our presentation of the facts is somewhat abbreviated. For a comprehensive recitation of the facts adduced at trial, reference can be made to the Appellate Division decision. *State v. Calleia*, 414 *N.J.Super.* 125, 129–38, 997 A.2d 1051 (App.Div.2010).

the nature of the relationship between the victim and defendant and whether their relationship had any significance in establishing defendant's motive to kill his wife:

1. Statements pertaining to wanting and seeking a divorce;

2. Statements pertaining to her unhappiness in her marriage;

3. Statements pertaining to her contact with and seeking advice from matrimonial attorneys related to pursuing a divorce; and

4. Her plans to attend a divorce seminar on the night of October 20, 2005.

In line with the court's ruling, the State produced testimony of several of Susan's friends, who uniformly revealed that Susan was unhappy with her marriage, was contemplating divorce, and described steps she had taken in furtherance of obtaining a divorce from defendant. Defendant's continuing objection to this body of evidence focused on the use of the victim's hearsay statements to support the motive being attributed to defendant. Suffice it to say that the evidence admitted was consistent with the trial court's ruling admitting the above mentioned categories of testimony.

Based on that evidence, the prosecutor strongly emphasized motive during his summation, stating in pertinent part:

> The motive was simple. Susan wanted a divorce and wanted to be on her own away from the defendant and the defendant didn't want that. And as it has been proven, yes, it should help you in coming to a conclusion in this case....

> The defendant didn't want Susan to stay because she was Susan; he wanted to keep intact his estate....

> ....

> And the problem, what was happening back then is that as I said apparently in my opening that this was escalating. That she had gone to see [divorce attorney] Richard Reich. She had gone to see [divorce attorney] Mario Gurrieri. She had gone to see [divorce attorney] Laura Witherington and things were getting closer. They asked [her friend Kathryn] Conguista on cross and she said she was going to give him a retainer that night. Mario. On her way to the seminar to see Mario. That she didn't care anymore if he knew what she was doing in terms of lawyers. That explains the check to Laura Witherington on a joint account. That explains her not caring about writing a check to Mario Gurrieri that night as [Kathryn] Conguista said she was going to do. She didn't care anymore and he knew that.

On the use of evidence of Susan's state of mind to support defendant's motive to kill, the trial court instructed the jury as follows:

You have heard testimony from witnesses about statements Susan Calleia made to them concerning unhappiness in her marriage to the defendant George Calleia and her intention to seek a divorce from the defendant. These statements can only be considered by you for two purposes. One, as evidence of Susan Calleia's state of mind, her plans and intentions. *And, two, as evidence of the nature of the relationship between Susan Calleia and the defendant to show that a relationship was not inconsistent with commission of homicide.*

*The State has taken the position that Susan Calleia's estrangement from the defendant, her plans to divorce the defendant and the defendant's knowledge of Susan Calleia's plans were motive for the defendant to kill Susan Calleia.*

The defense denies that the defendant George Calleia had any such motive. As I will instruct you in another part of my charge, the State is not required to prove a motive.... If the State has proven the essential element of the offense beyond a reasonable doubt, the defendant must be found guilty of that offense regardless of the defendant's motive or lack of motive.

If the State, however, has proved a motive, you may consider that insofar as it gives meaning to other circumstances. On the other hand, you may consider the absence of motive in weighing whether or not the defendant is guilty of the crime charged. *You may use Susan Calleia's statements only as proof of Susan Calleia's state of mind and as proof of the [s]tate of the relationship generally as I have previously explained.* Nothing more.

To determine the defendant's state of mind and motive, you may consider the nature of the defendant's acts and his conduct, and all he said and did during the pertinent timeframe and from the surrounding circumstances. For instance, the letter, D–37A, which was read into the record by Det. Angellini, allegedly written by the defendant to his wife, was admitted and you are allowed to hear it on the issue of defendant's state of mind.

If you find that he wrote the letter, you may consider it on the issue of whether or not there was a motive to kill his wife. *Defendant's motive if any to kill his wife because of the breakdown of the marriage and any impending divorce must be developed from evidence independent of decedent's statements concerning the nature of the relationship.*

The jury found defendant guilty on all charges and, on August 8, 2008, he was sentenced to an aggregate fifty-year prison term.

On appeal, the Appellate Division, in an unpublished portion of a partially published opinion, concluded that the hearsay statements regarding Susan's intent to terminate her marriage should not have been admitted. Relying primarily on *State v. Machado,* 111 *N.J.* 480, 545 *A.*2d 174 (1988), and *State v. Dreher,* 251 *N.J.Super.* 300, 598 *A.*2d 216 (App.Div.1991), *certif. denied,* 127 *N.J.* 564, 606 *A.*2d 374 (1992), the panel explained its understanding that state-of-mind hearsay evidence may not be used to prove motive.

Concluding that the hearsay statements admitted at trial imper-
missibly "gave the jury license to conclude that defendant mur-
dered his wife after she returned from a divorce seminar and
confronted him with her intention to terminate the marriage," the
panel reversed defendant's conviction.

## II.

With respect to state-of-mind hearsay evidence, the State ar-
gues before this Court that, although statements of a deceased
victim are not admissible when they merely illustrate the victim's
fear of defendant, where a statement does not evince a victim's
fear of a particular person and it is probative of a victim's
intended course of action, and where such action, if known by a
defendant, would give rise to a motive, the statement is properly
admissible as indicative of motive. According to the State, the
appellate panel in this matter relied on *Dreher, supra,* 251 *N.J.Su-
per.* 300, 598 *A.*2d 216, an aberrant case that ignored an otherwise
unbroken line of precedent that cleaved to a fear/no-fear distinc-
tion with respect to state-of-mind hearsay evidence. And, as
noted earlier, the State maintains that any error in the admission
of the hearsay evidence was harmless due to the non-hearsay
bases on which the same or similar facts were admitted properly,
the curative nature of the jury instruction, and the overwhelming
amount of incriminating evidence that defendant could not and did
not dispute.

Defendant relies primarily on two cases. First, defendant
points to this Court's *Machado* decision, which contained the
following statement: "Declarations of the victim's state of mind,
however, should not be used to prove the defendant's motivation
or conduct." *Machado, supra,* 111 *N.J.* at 489, 545 *A.*2d 174.
Second, defendant asserts that the holding and rationale of the
Appellate Division's opinion in *Dreher, supra,* established a per se
rule that state-of-mind hearsay is inadmissible to show another's
motive, regardless of whether the statements evince the victim's
fear. *See* 251 *N.J.Super.* at 317–19, 598 *A.*2d 216.

With those arguments as our backdrop, we turn to examine the present state of the relevant law.

### III.

### A.

### 1.

A line of cases in this state has discussed the admissibility of a victim's state-of-mind hearsay statements[2] when introduced for the purpose of proving motive. In *State v. Baldwin*, the prosecution had alleged that the defendant killed the victim to prevent him from testifying against the defendant on a separate robbery charge. 47 *N.J.* 379, 384, 221 *A.*2d 199, *cert. denied*, 385 *U.S.* 980, 87 *S.Ct.* 527, 17 *L.Ed.*2d 442 (1966). The opinion in *Baldwin* explains in straightforward fashion that statements made by the deceased that he intended to testify against the defendant were admissible because, along with evidence showing the defendant's awareness of the victim's intent, the statements were probative of motive. *Id.* at 391, 221 *A.*2d 199. The victim's state-of-mind allowed the jury to infer that the defendant was motivated to kill the victim to silence him. *Id.* at 391, 221 *A.*2d 199. However, there was another key issue in *Baldwin*. It concerned the admissibility of other hearsay statements within the state-of-mind exception, specifically a statement made by the victim the evening of the murder and two statements made by the defendant before and after the murder. *Id.* at 392–93, 221 *A.*2d 199.

All of the statements related to intended future actions between the victim and the defendant. The statements suggested they had a friendly relationship and dispelled the inference of a motive. *Id.*

---

[2] The state-of-mind exception to the prohibition against hearsay evidence is codified at *N.J.R.E.* 803(c)(3) and allows admission of "[a] statement made in good faith of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed[.]"

at 393, 221 *A.*2d 199. Defendant's statement subsequent to the murder also implicitly showed that defendant believed the victim was still alive. *Id.* at 394, 221 *A.*2d 199. The Court differentiated its analysis of the statements made prior to the murder from the statements made subsequently, and explained that hearsay statements by a victim or accused before a crime are typically admissible to show the parties' behavior leading up to the event. *Id.* at 394, 221 *A.*2d 199. Such statements of the victim and the accused were described as "bear[ing] upon either the quality of their acts or a relevant state of mind, [and hence] they must be accepted as part and parcel of the critical scene." *Ibid.*

Thereafter, in *Machado, supra,* we considered the admissibility of a deceased victim's hearsay statements that were used only to show her fear of the defendant. 111 *N.J.* at 481, 545 *A.*2d 174. After noting that some of the statements might be admissible as reflecting the nature of the relationship between the defendant and the victim, we concluded that "[d]eclarations of the victim's state of mind, however, should not be used to prove the defendant's motivation or conduct." *Id.* at 489, 545 *A.*2d 174. When discussing the rationale for that conclusion, we emphasized the prejudicial nature of statements evincing fear, and explained how some of the victim's hearsay statements might be admissible in a tailored form with the expressions of fear redacted, so long as the probative value of the statement was not substantially outweighed by any remaining prejudicial value. *Id.* at 489–90, 545 *A.*2d 174.

In *Machado,* the holdings of two Appellate Division cases received approving treatment—*State v. Downey* and *State v. Prudden*—both of which stemmed from the same set of facts and dealt with the admissibility of a victim's hearsay statement that illustrated no more than the victim's unfounded fear and suspicion of the defendants. *Id.* at 487–88, 545 *A.*2d 174 (discussing *State v. Downey,* 206 *N.J.Super.* 382, 502 *A.*2d 1171 (App.Div.1986), and *State v. Prudden,* 212 *N.J.Super.* 608, 515 *A.*2d 1260 (App.Div. 1986)). In those cases, the Appellate Division had held that it was reversible error for the trial court to admit a letter that stated,

"To Anyone, if anything happens to me or my kids you can go get, [names and addresses of defendants]. They would be the cause of it." *Downey, supra,* 206 *N.J.Super.* at 388, 502 *A.*2d 1171; *Prudden, supra,* 212 *N.J.Super.* at 612, 515 *A.*2d 1260. The Appellate Division explained that "the great weight of authority clearly precludes admission of a victim's expression of concern that another might have reason to harm him." *Downey, supra,* 206 *N.J.Super.* at 392, 502 *A.*2d 1171. Further, the Appellate Division found that any probative value stemming from "the victim's letter was far outweighed by its inflammatory nature." *Prudden, supra,* 212 *N.J.Super.* at 614, 515 *A.*2d 1260. Those decisions were the antecedents to our consideration of a similar issue in *State v. Benedetto,* 120 *N.J.* 250, 576 *A.*2d 828 (1990).

In *Benedetto,* we held that a victim's hearsay statements that evidenced no more than a sense of fear based on threats from an unidentified party were not admissible. *Id.* at 261, 576 *A.*2d 828. The prosecution had attempted to connect the victim's fearfulness to a debt that the victim owed the defendant's father. *Id.* at 252–54, 259–61, 576 *A.*2d 828. However, we placed the statements at issue in the same category as the statements in *Downey* and *Machado,* and concluded that they were no different than the sort of expressions of fear barred under those holdings. *Id.* at 259–60, 576 *A.*2d 828. Moreover, we noted that the hearsay statements served no probative purpose, failing to "explain [the decedent's] conduct on the night of his murder," and more generally finding that the statements were "not relevant to any issue and not explanatory of how defendant had acted on the night of his death." *Id.* at 261, 576 *A.*2d 828. Viewed in this light, the statements should have been excluded at trial because of their substantial potential for prejudice. *Ibid.*

The last case to be addressed in this line is *Dreher, supra,* a case on which defendant places substantial reliance, where the Appellate Division found that a victim's statements that she intended to leave defendant and obtain a divorce should not have been admitted. 251 *N.J.Super.* at 317–19, 598 *A.*2d 216. The

prosecutor had asserted at trial that the defendant's motive to plan and execute a horrific murder of his wife with the help of his lover, was to avoid a costly divorce, which the reviewing court, relying primarily on *Machado, Prudden,* and *Downey,* found to be impermissible. *Id.* at 316–17, 598 *A.*2d 216. The Appellate Division explained, "[i]t is settled that a decedent's hearsay statements are not admissible to prove the defendant's motivation or conduct, and convictions have been reversed where such statements were admitted." *Id.* at 317, 598 *A.*2d 216. Although the panel stated that it would permit certain statements that were necessary to show, as background, that the couple's relationship was foundering, the panel declined to find admissible any statements that were probative of the victim's specific intent to get a divorce. *Id.* at 318–19, 598 *A.*2d 216. In pertinent part, the panel included the following discussion that it asserted was controlling:

> As the State argued from the outset, its only purpose in offering proof of those hearsay statements was the impermissible one of demonstrating a motive for the murder. Its prejudicial impact cannot be underestimated. Had that evidence been excluded, all that the State would have been able to urge as a reason for the killing was the fact that defendant was mired in an unhappy marriage.... [I]t is entirely conceivable that a jury would be unable to discern a plausible reason why he would heartlessly slaughter the woman with whom, during their 15–year marriage, he had slept and eaten and raised two sons. But the introduction of evidence that Gail planned to leave defendant transformed this ambiguous picture into one of perfect clarity. Revealed by [the testifying witness] is the familiar, universally understood scenario for murder.... The argument was made without a shred of competent proof that Gail had taken any concrete steps to dissolve the marriage or, more importantly, that defendant even suspected her intention to do so.
> [*Ibid.*]

In conducting its analysis of this point, the *Dreher* court did not discuss any collaterally prejudicial aspects of the testimony to defendant or address the aspect of fear that had been prominent in the cases upon which it relied.

## 2.

 A synthesis of the aforementioned line of cases illuminates a clear evidentiary prohibition. A deceased victim's then-existing state of mind cannot *directly* prove a defendant's motive; the state-of-mind exception to the hearsay rule does not permit

imputation of a defendant's state of mind out of no more than a deceased person's feelings about that defendant. That is to say, subject to certain exceptions, a fact probative of the victim's state of mind, standing alone, does not tend to prove any material fact about a defendant's conduct or state of mind. *See Downey, supra,* 206 *N.J.Super.* at 391, 502 *A*.2d 1171 ("The important fact ... was the state of mind of the defendant, not that of the deceased."). That is the import to the admonition in *Machado, supra,* that "[d]eclarations of the victim's state of mind ... should not be used to prove the defendant's motivation or conduct." 111 *N.J.* at 489, 545 *A*.2d 174.

That principle has been used often to exclude a victim's statements of fear. *See Benedetto, supra,* 120 *N.J.* at 259–61, 576 *A*.2d 828; *Machado, supra,* 111 *N.J.* at 487–90, 545 *A*.2d 174; *Prudden, supra,* 212 *N.J.Super.* at 613–14, 515 *A*.2d 1260; *Downey, supra,* 206 *N.J.Super.* at 389–95, 502 *A*.2d 1171. Admitting a statement by a victim that he feared a defendant, where the victim gives no basis for his fearfulness that is tied to the defendant's mindset or knowledge, would erroneously sanction potential inferences that the victim must have had reason to fear the defendant or that the defendant must have had animus toward the victim (i.e. motive). Moreover, what is particularly harmful about statements of fear is their capacity, in conjunction with a defendant standing trial for a violent crime, to create an unsubstantiated inference that violence permeated the relationship between the victim and the defendant.

However, the legal premise urged by defendant—that a decedent's hearsay statements are *never* admissible to prove defendant's motivation—does not necessarily follow. No case prior to *Dreher* disallowed admission of a victim's hearsay statement when it was proffered to show that a victim was planning a certain course of conduct, which conduct would provide a motive if the defendant knew about it. To address whether the state-of-mind exception to the hearsay rule may be utilized in such a manner, we must also take into account and reconcile our law on the subject of motive evidence.

## B.

Case law and treatises have recognized the special role of motive evidence and its unique capacity to provide a jury with an overarching narrative, permitting inferences for why a defendant might have engaged in the alleged criminal conduct. *See, e.g., State v. Carter,* 91 *N.J.* 86, 102, 449 *A.*2d 1280 (1982) (explaining that purpose of motive is "to aid the jury, particularly in a case resting upon circumstantial evidence, in determining who the person was who committed the crime"); 1 *Wharton on Criminal Evidence* § 4:45, at 479 (15th ed. 1997) (explaining that motive evidence can "establish the identity of the defendant as the person who committed the offense" and that an "inquiry as to motive is often of great importance, particularly in a case based largely on circumstantial evidence"). Often, motive must be pieced together; potential motivating factors must be gleaned from evidence that does not itself bespeak criminal intent but merely explains what events might have led the accused to commit a criminal act. *See* 41 *C.J.S. Homicide* § 325 (2006) ("Any evidence which has a legitimate bearing on the question of motive is as a general rule admissible" so long as it "at least to a slight degree tend[s] to establish the existence of the motive relied on."). Therefore, motive is treated somewhat differently than other types of evidence, as this Court has explained:

> In criminal prosecutions, whenever the motive or the intent of the accused is important and material, a somewhat wider range of evidence is permitted in showing such motive or intent than is allowed in the support of other issues. *Hendrickson v. People,* 10 *N.Y.* 13, 31 (1854). Otherwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist. Such intent or motive may be proved either by direct or circumstantial evidence. All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him. . . .
>
> [*State v. Rogers,* 19 *N.J.* 218, 228, 116 *A.*2d 37 (1955).]

The principle that supports the broad admission of motive evidence was reaffirmed in *State v. Covell,* 157 *N.J.* 554, 565, 725 *A.*2d 675 (1999). We reiterated that a "wider range of evidence"

is permitted to prove motive, so long as it remains a material issue in a case. *Covell, supra,* 157 *N.J.* at 565, 725 *A.*2d 675.

In light of its unique probative function, a strong showing of prejudice is necessary to exclude motive evidence under the balancing test of *N.J.R.E.* 403. *See State v. Koskovich,* 168 *N.J.* 448, 486, 776 *A.*2d 144 (2001); *Covell, supra,* 157 *N.J.* at 570, 725 *A.*2d 675. Where the prosecution has a theory of motive that rests on circumstantial evidence, that evidence should not be excluded merely because it has some capacity to inflame a juror's sensibilities; to hold otherwise would preclude a jury from inferring a defendant's "secret design or purpose." *See Rogers, supra,* 19 *N.J.* at 228, 116 *A.*2d 37. A reasonably broad allowance for motive evidence permits jurors, in their role as fact-finders and judges of credibility, to reject a given explanation for conduct as inconsistent with their understanding of human nature, or to accept a motive as a rational premise that could lead a defendant to criminality.

Time and again, courts have admitted motive evidence even when it did no more than raise an inference of why a defendant may have engaged in criminal conduct, and even in the face of a certain degree of potential prejudice stemming from the evidence. *See, e.g., State v. Rose,* 206 *N.J.* 141, 19 *A.*3d 985 (holding admissible prior indictment for attempted murder to show motive for subsequent murder of same victim); *Covell, supra,* 157 *N.J.* at 571, 725 *A.*2d 675 (holding defendant's statement regarding prior lewd conduct admissible to show motive for subsequent child luring); *State v. Smith,* 55 *N.J.* 476, 487–88, 262 *A.*2d 868 (holding admissible evidence that defendant's license had been revoked as showing motive for attack on officers who stopped his car), *cert. denied,* 400 *U.S.* 949, 91 *S.Ct.* 232, 27 *L.Ed.*2d 256 (1970); *Rogers, supra,* 19 *N.J.* at 228–29, 116 *A.*2d 37 (holding admissible evidence of earlier financial dealing in trial for murder on theory that defendant was motivated by desire to avoid paying victim); *State v. Castagna,* 400 *N.J.Super.* 164, 187, 946 *A.*2d 602 (App.Div.2008) (holding admissible evidence of temporary restraining order and

criminal complaint related to domestic violence where State's theory was that defendant conspired to kill spouse to avoid suffering adverse employment consequences of restraining order); *State v. Cherry*, 289 *N.J.Super.* 503, 527–28, 674 *A.*2d 589 (App. Div.1995) (holding admissible evidence of defendant's hatred of police and participation in Black Panther Party as motive evidence when defendant charged with shooting officer); *State v. Crumb*, 277 *N.J.Super.* 311, 317–18, 649 *A.*2d 879 (App.Div.1994) (holding racist writings admissible to show racial-hatred motive for killing stranger).

Furthermore, motive evidence is less likely to be excluded under the balancing of *N.J.R.E.* 403 when it does not evince some underlying propensity of the defendant that could lead a jury to conclude that violence or depravity are in the defendant's nature. However, even when such a danger persists, courts have admitted evidence of prior convictions and other bad acts when they permit a jury to infer motive. *See, e.g., Rose, supra,* 206 *N.J.* at 156, 19 *A.*3d at 994; *Covell, supra,* 157 *N.J.* at 571, 725 *A.*2d 675; *Castagna, supra,* 400 *N.J.Super.* at 187, 946 *A.*2d 602; *Crumb, supra,* 277 *N.J.Super.* at 318, 649 *A.*2d 879.

### C.

In light of the important role of motive evidence, and the solicitous treatment by courts in regard to its admission, we see no reasoned basis for assuming a per se rule that hearsay statements by a deceased victim may never be admitted under the state-of-mind exception to prove motive. The seemingly contradictory and, perhaps overly, broad statement in *Machado* was intended only to convey that the then-existing state of mind of a victim cannot directly impute to a defendant a certain state of mind. Without more, a victim's fear of a defendant is not probative of a defendant's potential motive.

However, when testimony regarding a decedent's state of mind establishes a fact that, if known by defendant, could give rise to a motive, such testimony is admissible subject to balancing

under *Rule* 403. That said, a fact can only be probative on the question of motive if a defendant is aware of that fact. Thus, in order to be admissible as motive evidence, the State must directly or circumstantially show that the accused probably knew of the facts that are alleged to have given rise to the motive. *See* 2 *Wigmore on Evidence* § 389, at 417 (Chadbourn rev.1979) (explaining that circumstance that gives rise to motive *"must be shown* to have probably *become known* to the [accused]"); 40A *Am.Jur.2d Homicide* § 264 (2008) (explaining that "facts that are not directly or circumstantially shown to have been known to the accused at the time of the homicide are not admissible"); *accord Roger v. State,* 224 *Ga.* 436, 162 *S.E.*2d 411, 413 (1968); *People v. Easley,* 148 *Ill.*2d 281, 170 *Ill.Dec.* 356, 592 *N.E.*2d 1036, 1056 (1992), *cert. denied,* 506 *U.S.* 1082, 113 *S.Ct.* 1055, 122 *L.Ed.*2d 361 (1993); *State v. Reed,* 53 *Kan.* 767, 37 *P.* 174, 178 (1894); *Bolen v. Commonwealth,* 250 *Ky.* 593, 63 *S.W.*2d 772, 773–74 (1933); *State v. Potter,* 60 *N.D.* 183, 233 *N.W.* 650, 657–58 (1931); *Son v. Territory,* 5 *Okla.* 526, 49 *P.* 923, 926 (1897).

Thus, when a victim's state-of-mind hearsay statements are relevant to show the declarant's own conduct, and when such conduct is known or probably known to the defendant, it also can give rise to motive, and the statements become admissible for that purpose, subject to the usual balancing under *N.J.R.E.* 403. That conclusion is consonant with the broad leeway allowed for submissions of motive evidence. A victim's hearsay statements need not indisputably show a concrete motive; rather, "a tendency in reason" to illustrate a possible motive is enough. *N.J.R.E.* 401 (defining relevance). When a victim's projected conduct permits an inference that defendant may have been motivated by that conduct to act in the manner alleged by the prosecution, the statement satisfies the threshold for relevance. *See, e.g., Rogers, supra,* 19 *N.J.* at 228, 116 *A.*2d 37 ("[M]otive may be proved either by direct or circumstantial evidence. All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his

actions are admissible[.]"). Of course, trial courts should remain vigilant to ensure that an evidentiary submission's probative value is not substantially outweighed by prejudicial effect. *N.J.R.E.* 403.

One final observation requires mention. Our discussion of the present state of the law is at odds with certain language in *Dreher*, specifically the portion of that opinion explaining that state-of-mind hearsay evidence can never, in any fashion, be admitted as probative of motive. We reject that contrary statement of the law in *Dreher*.[3] There can be no misunderstanding: a prosecutor must demonstrate that a defendant knew or likely knew of a victim's conduct in order for the victim's conduct to provide motive evidence.

## IV.

## A.

We turn now to the evidence admitted in controversy in this matter.

Susan's best friend, Eileen Hansen, testified that Susan had decided by the end of July or early August 2005 that she was unhappy in her marriage and wanted a divorce from defendant. Eileen explained that while she spent time with Susan during the summer and fall of 2005, she learned that Susan wanted a divorce and she noticed that Susan had stopped wearing her wedding and engagement rings. During that time, Eileen had helped Susan

---

[3] We need not comment further on the holding of *Dreher* for we do not suggest that we would not ultimately have reached the same decision on the facts of that case. The Appellate Division's decision in that matter recounted no evidence in *Dreher* showing that the defendant was aware his wife wanted a divorce; as such, the hearsay statements' probative value may have been minimal because a defendant can only be motivated by that which he knew or likely knew. *See Dreher, supra,* 251 *N.J.Super.* at 319, 598 *A.2d* 216 ("The [State's] argument was made without a shred of competent proof that Gail had taken any concrete steps to dissolve the marriage or, more importantly, that defendant even suspected her intention to do so.").

look for divorce attorneys; had allowed Susan, in her presence, to use her home phone to call divorce attorneys; and had helped Susan copy financial documents on her copier. Eileen observed that Susan was very careful with the documents, which had been secreted from the marital home so they could be copied.

Eileen further testified to the following additional information about Susan. Susan told Eileen in conversations that she had met with divorce lawyers and was using Eileen's phone number as her return phone number. Susan said that defendant wanted to buy her a separate place in which to live so they would not have to divorce and split up their assets, and that defendant and she had looked for a place where she and Ana could move. Although she and defendant attended marriage counseling, Susan told Eileen that it did not alter her desire to obtain a divorce. And, finally, Eileen testified that Susan had asked that she accompany her to a divorce seminar being conducted in Summit at 7:30 p.m. on the evening that Susan disappeared, but Eileen had been unable to attend.

Lori Boxer, another friend of Susan, also testified that, a few months before her death, Susan had told her that she was unhappy and wanted out of her marriage. Susan also told Lori that she no longer slept in the marital bedroom with defendant, had attended marriage counseling, and had spoken with two divorce attorneys.

According to the testimony of Susan's friends, Kathryn and Joseph Conguista, Susan was storing copies of financial documents in a briefcase kept in their home. Joseph testified that on or around August 11, 2005, he accompanied Susan to a meeting at the law office of Mario Gurrieri, a divorce attorney whose name Joseph had provided to Susan. Susan brought along the financial documents she had compiled.

Kathryn, who testified that she spent time with Susan daily from August 2005 until her disappearance, said that Susan had not been wearing her wedding or engagement rings for a while. The two often spoke about Susan's desire to get a divorce. Kathryn

encouraged Susan to consult attorneys, and gave her $500 to pay for a consultation. Kathryn recalled a telephone conversation in which she provided Susan with the name of Richard Reich, a divorce attorney. Kathryn also was told by Susan that she and defendant had been to a marriage counselor, but that it did not deter her desire to obtain a divorce.

Kathryn also testified about a conversation she had with Susan on the day that she disappeared.[5] Susan visited Kathryn at her home on Thursday, October 20, and informed Kathryn that an attorney, Mario Gurrieri, had invited her to a divorce seminar in Summit that evening. Susan asked Kathryn to go with her; however, Kathryn could not accompany her because of other plans. Susan then called Gurrieri, in Kathryn's presence, to obtain directions to the seminar. According to Kathryn, Susan intended to sign a retainer agreement while at the seminar, and she was mulling over how to pay Gurrieri without defendant knowing. Kathryn testified that Susan then apparently resolved not to be so concerned about secrecy, paraphrasing Susan's words as, "what the heck, she'll just write a check and he'll find out when it's cashed."

This evidence in its totality demonstrated that Susan had consulted with three different divorce attorneys to discuss the possibility and the ramifications of obtaining a divorce from defendant. She did not retain any of them. Richard Reich, a family law attorney, testified that he had a consultation with Susan on July 28, 2005 to discuss a possible divorce, charged her $150 for the consultation, and never saw her thereafter. Mario Gurrieri testified that he met with Susan and Joseph Conguista for a consultation on August 11, 2005. Susan paid $400 in cash for the consultation and indicated to Gurrieri that she did not want any bills mailed to her home. Subsequently, Gurrieri called Susan to follow up and invited her to a divorce seminar he was giving on October 20, 2005 in Summit. The seminar took place as scheduled, starting at about 7:15 p.m. and lasting approximately two hours, but Susan was not in attendance. Another matrimonial law attorney,

Laura Witherington, testified that she met with Susan on October 12, 2005 for an initial consultation regarding a possible divorce. She testified that Susan had requested that she be contacted only by cell phone. Susan paid Witherington a $200 consultation fee with a check drawn on a joint Chase Bank account in the names of George and Susan Calleia. Susan did not retain Witherington, and Witherington never spoke with her again.

A forensic analysis of defendant's laptop computer revealed that someone under defendant's username had accessed the couple's Chase online account. Someone under defendant's username also conducted searches for matrimonial attorneys, searched for the terms "Witherington" and "Laura Witherington," and also accessed the webpage of Witherington's law firm.

James P. Hogan, defendant's exercise partner at the gym, testified that he had invited defendant and his wife to attend a Halloween party in October 2005, but that defendant had responded that "me and my wife might be heading towards a divorce. I'm not really sure what is going on or what's going to happen." He also testified that defendant had suggested that he did not want a divorce and instead wanted to work things out.

Debbie DiGiaro, who worked as a real estate agent, testified that she met with Susan, alone, on October 10, 2005 to look at a townhouse about which Susan had expressed interest. When Debbie provided Susan with a form regarding the agent/client relationship, Susan indicated that she was getting divorced and that she was looking at the property for herself and her daughter. During a follow-up call a week later, Debbie discussed the property and told Susan about setting up automatic email notification of properties that might interest her, which Debbie thereafter set up for her.

Jerry Maiorani testified that on October 16, 2005, he showed a townhouse, which he owned and was privately selling, to defendant, who was accompanied by his wife and daughter. According to Maiorani, they loved the place; however, he never heard back from them.

## B.

Focusing on Susan Calleia's hearsay statements recited through the above testimony, we note initially that such statements can be admitted through *Rules* 803(c)(3) and 401 because they are relevant to show the declarant's conduct, specifically that she took steps toward obtaining a divorce. Her described conduct, conjoined with defendant's awareness of her actions, is itself relevant because it gives rise to a possible motive to kill her. Sufficient competent evidence was admitted that showed that defendant knew about his wife's unhappiness in the marriage and that she was interested in a divorce. Therefore Susan's statements to that effect to Eileen, Kathryn, and Lori did not reveal any information that defendant did not know himself. Moreover, to the extent that the three women repeated Susan's statements that she was following up on seeking out a divorce attorney, that too was generally known to defendant, although he might not have been aware of the details of Susan's consultations with attorneys. Forensic analysis of defendant's computer and online banking history strongly support his awareness that his wife wrote a check to a divorce attorney. And, his own statements to the police and to his friends demonstrated that he knew of his wife's unhappiness and interest in obtaining a divorce.

It takes no great leap of intuition to understand that divorce could motivate a person to kill. Our case law illustrates that motive evidence has been deemed sufficiently relevant when far greater leaps have been required. *See supra* Part III.B (listing cases in which evidence was admissible as sufficiently probative of motive). It is surely consistent with the essential role of the jury to assess whether a given defendant might be driven to kill to avoid a divorce, with its attendant costs, or whether the prosecution has failed to show that the asserted motivating factors could in fact drive the defendant to commit the acts alleged.

Importantly in this case, the victim's hearsay statements do not contain otherwise unfounded statements of fear, which would be prejudicial and could potentially inflame jurors. *See N.J.R.E.* 403

(relevant testimony only admissible if probative value not substantially outweighed by prejudicial harm). Therefore, the statements by Susan to her friends do not raise the prejudicial concerns that have caused courts to be especially vigilant gatekeepers. *See Machado, supra,* 111 *N.J.* at 489, 545 *A.*2d 174 (excluding statement that was irrelevant to proving any material fact, and noting that portions of statement "that express fear of defendant are prejudicial"); *Downey, supra,* 206 *N.J.Super.* at 390–93, 502 *A.*2d 1171 (finding statement irrelevant because it showed victim's, not defendant's, state of mind, and noting that admitting hearsay statements of victim's fear in situations even when they are relevant is "fraught with inherent dangers and require[s] rigid limitations including clear limiting instructions"). Even aside from not evincing fear, the statements here do not show any actions or propensity of defendant that might prejudice his ability to be assessed fairly by a jury. They merely show that defendant was in a faltering marriage, hardly a sin in this age.

## C.

All that said, we are not unconcerned, however, with the sheer amount of evidence the trial court permitted, all cumulative of the same essential point: that Susan Calleia intended to divorce her husband and had likely taken a number of actions to that effect. Insofar as the State was able to present enough evidence to show that defendant likely knew his wife was interested in a divorce, additional statements that prove various actions by her to facilitate the divorce were unnecessarily cumulative and potentially distracting to a jury. *See N.J.R.E.* 401, 403. Moreover, in specific regard to the hearsay statements at issue, they have no probative value unless defendant at least might have been aware of the actions revealed by such statements.

Here there was no hard evidence, nor any likelihood that could be inferred, that defendant was aware of many of the victim's specific actions revealed through the hearsay testimony of Susan's statements. We note that defendant knew generally of Susan's

intentions about, but not the precise circumstances of, Susan's meeting with a divorce attorney, that marriage counseling did not change her mind about her interest in a divorce, and that she was looking at property into which she and her daughter could move. Clearly there were some statements of Susan's that were admitted notwithstanding that there was no showing that defendant knew or had a likelihood of knowing their content, such as, for example, Eileen's and Kathryn's testimony about Susan asking each to accompany her to the divorce seminar scheduled for the evening of October 20. Nor does the record support any inference that defendant would have known of Susan's professed intent to sign a retainer agreement that night, or of Susan's individual conversations with each of the attorneys with whom she met. Nonetheless, we perceive no reversible error for three reasons.

First, in regard to defendant's assertion that the trial court erred in admitting extensive hearsay statements through the state-of-mind exception, most of the content of those submissions was also admitted through means other than state-of-mind hearsay. Specifically, the witnesses' experiences and observations supported their testimony as to the following facts: that Susan was not wearing her wedding rings starting around August 2005; that she stored financial documents at her friends' houses; that she searched for, and called, divorce attorneys in her friends' presence; that she met with Mario Gurrieri, a divorce attorney, prior to the events that transpired on October 20 and had paid him $400; that he subsequently called Susan to invite her to a divorce seminar in Summit on the evening of her disappearance; that Susan went to Kathryn Conguista's house that evening, where she called Gurrieri to get directions; that two other matrimonial/family law attorneys also had met with Susan; that one of them, Laura Witherington, testified that Susan came for an initial consultation, and paid $200 by check drawn from the Calleias' joint Chase Bank account; that forensic analysis of defendant's laptop revealed that a person signed in under defendant's username had accessed a Chase online bank account and conducted searches for matrimonial attorneys, including Laura Witherington and her law firm;

and that Debbie DiGiaro, a real estate agent, met with Susan alone, on October 10, 2005, to look at a townhouse in which Susan had expressed interest. Further, defendant's own statements, admissible as party admissions, do not hinge on application of the state-of-mind exception: defendant told his exercise partner, "me and my wife might be heading towards a divorce. I'm not really sure what is going on or what's going to happen."

Second, we address the corollary problem with the evidence noted earlier that at least for some of this evidence defendant had no way of knowing its detail. Thus, it was evidence that went beyond what should have been permitted to support the State's motive theory. Yet, in their proper context, those few specific details that the record does not show defendant knew or likely knew were not particularly damaging. Rather, these points continued to show, in greater detail, that Susan was doing and saying much about her interest in pursuing a divorce (which defendant knew), and that she had taken the step of seeking out an attorney (likely known to defendant based on the forensic evidence showing the computer searches conducted under his username).

Third, and finally, we are not overly concerned about the cumulative extent of the testimony pertaining to an impending divorce because the hearsay statements permitted at trial through the state-of-mind exception did not include collateral elements that might inflame or otherwise prejudice a jury. The statements had no inferential value except in confirming that a divorce appeared imminent and, thus, that defendant may have had a motive. Therefore, while the amount of statements admitted may have been a distraction, we see no great potential for the statements to have confused a jury about its proper role, or to have diverted the jury from a fair and evenhanded approach to the task at hand. Importantly, there was other strong independent evidence to be considered here, namely, the scream heard by the neighbor; defendant's behavior in shielding his right hand, with its teeth marks, from the police the morning he reported his wife missing; his various explanations to the police; his calling 911 before calling

his wife's cell phone; his familiarity with the location where Susan's body was found; and the DNA evidence. Based on this record, there is no likelihood that an unjust result was achieved based on the slim body of extra evidence that was admitted as motive evidence even though the State failed to connect it up as information known or likely known by defendant.

In conclusion, a deceased victim's hearsay statements that do not express a fearfulness of defendant are not categorically prohibited from admission through the state-of-mind exception as evidence of motive. Any error in this case stemming from the cumulative nature of the submissions and the potential overuse of the hearsay exception for a motive purpose is harmless.

## V.

The judgment of the Appellate Division is reversed and defendant's conviction is reinstated. We remand this matter to the Appellate Division to permit consideration of defendant's sentencing claims of error, which the panel had not reached in light of its earlier judgment.

*For reversal/reinstatement/remandment*—Chief Justice RABNER, Justices LONG, LaVECCHIA, ALBIN, RIVERA-SOTO, HOENS and Judge STERN (temporarily assigned)—7.

*Opposed*—None.