**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1469-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TAHJ J. PINES,

    Defendant-Appellant.

_____

Submitted September 19, 2023 – Decided January 4, 2024

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 09-07-1467.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent (Lisa Sarnoff Gochman, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Tahj J. Pines' challenge to his conviction and fifty-year sentence for murder, armed robbery, and weapon offenses returns to us following a second PCR court order—with the State's consent—allowing defendant to file a new direct appeal with this court. The PCR court determined defendant received ineffective assistance of appellate counsel because defendant's attorney had simultaneously represented defendant and co-defendant LaShawn Fitch on appeal. This court previously affirmed the denial of defendant's first appeal and first PCR petition. State v. Pines, No. A-4721-12 (App. Div. April 14, 2016); State v. Pines, No. A-1715-18 (App. Div. Feb. 20, 2020).

Defendant now contends:

> POINT I
>
> DEFENDANT'S MOTION TO SUPPRESS HIS STATEMENT TO THE POLICE WAS IMPROPERLY DENIED, AS THE STATE FAILED TO PROVE THAT DEFENDANT MADE A VOLUNTARY, KNOWING, AND INTELLIGENT WAIVER OF HIS FIFTH AMENDMENT RIGHTS BEYOND A REASONABLE DOUBT.
>
> POINT II
>
> THE TRIAL COURT ERRED BY ADMITTING INTO EVIDENCE A STATEMENT OF THE VICTIM AS

2

AN EXCEPTION TO HEARSAY PURSUANT TO N.J.R.E. 803(c)(3).

POINT III

THE TRIAL COURT ERRED BY FAILING TO SUA SPONTE INSTRUCT THE JURY AS TO THE AFFIRMATIVE DEFENSE TO FELONY MURDER SET FORTH IN N.J.S.A. 2C:11-3(a)(3). (Not Raised Below).

POINT IV

DEFENDANT'S FIFTY YEAR NO EARLY RELEASE SENTENCE IS AN EXCESSIVE SENTENCE WHICH IS UNCONSCIONABLY DISPARATE IN RELATION TO THE SENTENCES IMPOSED ON SIMILARLY SITUATED CO[-]DEFENDANTS.

In a supplemental self-represented brief, defendant raises these additional arguments which are renumbered for ease of reference:

POINT V

[THE] PROSECUTOR VIOLATED DEFENDANT'S DUE PROCESS ON THE RIGHT OF A FAIR TRIAL BY MAKING IMPROPER STATEMENTS DURING SUMMATION, VIOLATING DEFENDANT'S 5TH[,] 6TH[,] AND 14TH AMENDMENT RIGHTS[,] COMMITTING PROSECUTORIAL MISCONDUCT. (Not Raised Below).

POINT VI

[THE] PROSECUTOR VIOLATED DEFENDANT'S DUE PROCESS [RIGHTS] AND RIGHT TO FAIR

3 A-1469-21

TRIAL BY [MAKING] IMPROPER REMARKS OF KNOWLEDGE BEYOND THAT WHICH IS CONTAINED IN EVIDENCE THUS COMMITTING P[R]OSECUTORIAL MISCONDUCT. (Not Raised Below).

POINT VII

[THE] TRIAL COURT VIOLATED DEFENDANT'S DUE PROCESS BY INSTRUCTING [THE] JURY [ON] FIRST[-]DEGREE CONSPIRACY TO COMMIT ARMED ROBBERY AND OMITTING [IT] ON [THE] VERDICT SHEET. (Not Raised Below).

POINT VIII

[THE] IMPROPER LESSER-INCLUDED OFFENSE CHARGE ON CONSPIRACY TO COMMIT ARMED ROBBERY OR ROBBERY VIOLATES DUE PROCESS 5TH, 6TH, AND 14TH AMENDMENT RIGHTS. (Not Raised Below).

Based upon our review of the parties' arguments, the record, and applicable legal principles, we affirm.

I

The testimony regarding defendant's arrest and conviction are well known to the parties and summarized in our prior opinions. See Pines, No. A-4721-12, slip op. at 4-9; Pines, No. A-1715-18, slip op. at 2-4. We need not detail it here. We do, however, discuss the relevant facts and trial court proceedings when addressing the issues raised on appeal.

4

A-1469-21

II.

We begin with defendant's challenge in Point I that the trial court improperly denied his motion to suppress his statement to the police because the State failed to adequately prove his Miranda[1] waiver was made voluntarily, knowingly, and intelligently.

A.

Over two weeks after the murder of Nathaniel Wiggins during a botched robbery attempt, Monmouth County Prosecutor's Office (MCPO) Detective Daniel Baldwin contacted defendant for an interview to determine defendant's location when the crime occurred and to collect a DNA sample. At the time, only Kenneth Michael Bacon-Vaughters (Kenny Mike) and Aron Pines, defendant's brother, were charged with the murder, and although defendant was a suspect, there was no arrest warrant for him. Defendant consented to being taken to a police station, where his interview was video-recorded, and a transcript of the proceeding was prepared.

Baldwin informed defendant that he "want[ed] to talk about the situation your brother got himself into . . . the whole Kenny [Mike] and the event that happened for him being arrested for homicide." Defendant was read his Miranda

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

rights and verbally responded that he understood each right. Defendant seemed confused, however, about the concept of waiving his rights, stating "I don't want to give up my [rights] . . . I don't want to do that . . . but I'll answer [all] you[r] . . . questions." MCPO Detective Edward Nelson told defendant his waiver "ha[d] to be all or nothing." Baldwin and Nelson noticed defendant did not understand what "waiver" meant, and the following exchange occurred:

> Baldwin: [Y]ou know what it is, you don't understand what we're asking you . . . and that's fine but . . . when we say waive your rights . . . meaning, do you agree with each one of these statements?
>
> Defendant: [Y]es . . .
>
> Baldwin: [E]ach of the rights we are referring to . . . do you agree with that? . . . [T]hat's what waiving your rights means . . .
>
> Defendant: [T]his is why I'm here . . .
>
> Baldwin: [O]kay . . . [S]o the terminology of waiving your rights meaning, you're waiving these rights and you're agreeing to speak with us . . .
>
> Defendant: [O]h, yes yes. . .
>
> Baldwin: [Y]ou understand now . . . you clearly understand what . . .
>
> Defendant: [Y]es . . . I understand what you're saying . . .

> Baldwin: [I]t's just the language you didn't understand
> . . .

Defendant: [Y]es . . .Defendant did not provide any incriminating information directly tying him to the murder. However, his statement that he was in Farmingdale at the time of the murder was later found to be untruthful.

Defendant argues he did not understand the concept of a <u>Miranda</u> rights waiver as evinced by his reluctance to sign the waiver form despite his willingness to answer questions. He maintains Nelson's statement that "it has to be all or nothing" is legally incorrect because a suspect may invoke their right to remain silent even after making a valid <u>Miranda</u> waiver. <u>See</u> <u>State v. Tillery</u>, 238 N.J. 293, 315 (2019). Furthermore, defendant asserts Baldwin did not "sufficiently address [his] confusion by merely telling him a waiver meant he agreed 'to each of these statements' and 'are waiving these rights.'"

Defendant stresses there were no criminal charges against him when he was interviewed, even though Ian Everett—who was with defendants and his co-defendants the day after the murder—had implicated him in the crime the previous day. The interview was focused on making defendant believe his co-defendants had confessed to gauge his reaction, which Baldwin admitted failed because defendant did not confess. Moreover, the interview did not provide the police with any new facts to establish probable cause, but defendant's alibi was

later contradicted by cell phone records. Defendant claims the prosecutor did not authorize his arrest until after the interview based on defendant's reactions to the questions and refusal to consent to a buccal swab. Although Baldwin conceded they would have sought an arrest warrant regardless of whether defendant refused the buccal swab, defendant contends his refusal is no grounds for issuing an arrest warrant.

In summary, defendant asserts the detective's delay in filing a criminal complaint against him until after the interview was meant to evade the requirement that an accused be notified of any criminal charges before questioning. See State v. A.G.D., 178 N.J. 56, 66 (2003). He maintains "by giving [him] the impression that he was not about to be charged with murder," "the police were fishing for incriminating information by means of trick and artifice."

## B.

We review the trial judge's factual findings in support of granting or denying a motion to suppress to determine whether "those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). Where the trial judge determines that a defendant waived the right to remain silent based solely on a video-recorded statement or documentary

evidence, our Supreme Court has held that we defer to the judge's factual findings. State v. S.S., 229 N.J. 360, 379-380 (2017).

The S.S. Court also addressed and reaffirmed this State's historical commitment to an individual's right against self-incrimination. "The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." Id. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). Most importantly, the Court reaffirmed the standard a reviewing court must employ to determine if a defendant asserted his right against self-incrimination, stating:

> [T]hat . . ."[a]ny words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case with the police are tantamount to an invocation of the privilege against self-incrimination." In those circumstances in which the suspect's statement is susceptible to two different meanings, the interrogating officer must cease questioning and "inquire of the suspect as to the correct interpretation." Unless the suspect makes clear that he is not invoking his right to remain silent, questioning may not resume. In other words, if the police are uncertain whether a suspect has invoked his right to remain silent, two alternatives are presented: (1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his right to silence.
>
> . . . .

> To invoke the right to remain silent, a suspect does not have to follow a prescribed script or utter talismanic words. Suspects are mostly lay people unschooled in the law. They will often speak in plain language using simple words, not in the parlance of a constitutional scholar. So long as an interrogating officer can reasonably understand the meaning of a suspect's words, the suspect's request must be honored.
>
> [Id. at 382-83 (citations omitted).]

Based upon our de novo review of the denial of defendant's suppression motion, see State v. Tiwana, __ N.J. __, __ (2023) (slip op. at 9), we conclude the detectives gave defendant adequate Miranda warnings before defendant waived his right to remain silent before voluntarily giving a statement. The State proved beyond a reasonable doubt that defendant's statement was voluntary. State v. L.H., 239 N.J. 22, 42 (2019). Thus, the court here did not abuse its discretion in allowing defendant's alibi statement to be introduced. See State v. Green, 236 N.J. 71, 81 (2018) (acknowledging appellate courts affirm the trial court's evidentiary rulings absent an abuse of discretion).

The video and interview transcript demonstrate defendant's initial failure to understand the term "waiver" was resolved by the detectives' explanations. The first indication of defendant's misunderstanding was his request for further explanation after Baldwin stated: "[A] decision to waive these rights is not final

10

and you may withdraw your waiver whenever you wish, either before or during questioning . . . do you understand that right?"  Nelson further explained "we can ask you one question or we can ask you a hundred, but whenever you want, you can cut us off."  Defendant then indicated he understood this right.

Although defendant expressed uncertainty about waiving his rights and refused to sign the Miranda form, asking if he was under arrest, defendant's rights were not violated.  After informing defendant he was not under arrest, the detectives sought to clarify whether he was agreeing to speak with them. Defendant told them, "[T]hat's why I'm here."  Nelson wanting further clarification, however, asked if defendant waived his rights, which resulted in defendant expressing confusion and stating:  "[W]hat you mean like . . . do I give my rights up?"  As Nelson attempted to explain again, defendant made a series of ambiguous statements, demonstrating both an unwillingness to waive his rights and a desire to answer their questions:  "[Y]eah[,] I don't want to waive my rights . . . cause I don't fully understand that . . . I'll answer [all] you[r] . . . questions . . . . I'm not waiving my rights because I don't know what's going on."  Baldwin recognized the dilemma, acknowledging "he doesn't understand what it means" when the detectives used the word "waiver."  Baldwin then explained waiver as defendant "agree[ing] with each of these statements,"

11

detailing his rights, and "the terminology of waiving your rights meaning, you're waiving these rights and . . . agreeing to speak with us." Defendant again stated speaking to the police was "why I'm here," and, after Baldwin's explanation, defendant stated, "oh, yes . . . I understand what you're saying," confirming he initially misunderstood the language.

As such, defendant voluntarily, intelligently, and knowingly waived his Miranda rights. He explicitly stated, three separate times, that he wanted to speak to the police and no coercive practices were present, indicating the waiver was voluntary. Defendant was a seemingly intelligent adult who simply misunderstood the term "waiver." Based on Baldwin's explanation that a waiver was needed to continue with the interview, defendant's confirmed understanding of Nelson's statements that he could stop the interview at any time by invoking his rights, and defendant's explicit affirmative response when he figured out what the detectives meant by "waived," constituted defendant's knowing and intelligent waiver of his Miranda rights. See State v. A.M., 237 N.J. 384, 397 (2019) (noting "[a]ny clear manifestation of a desire to waive is sufficient" (alteration in original) (quoting State v. Hartley, 103 N.J. 252, 313 (1986))). Defendant's unequivocal affirmative statements that he waived his rights after Baldwin's explanation of "waiver" demonstrates his recognition that he initially

12

did not understand the term "waiver" but eventually had his "eureka" moment of clarity, dispelling any misunderstanding. As such, there is no indication the trial court abused its discretion in admitting defendant's statement. See id. at 396.

We further conclude defendant's argument that the detectives purposefully declined to file the criminal charges before interviewing him to get incriminatory information is meritless. Preliminarily, defendant did not argue this before the trial court and, consequently, it is not properly before us because it neither "go[es] to the jurisdiction of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). Nevertheless, there is no evidence the detectives intentionally sought to avoid the requirements of A.G.D. by waiting until after the interview to obtain an arrest warrant and file criminal charges against defendant. Cf. 178 N.J. at 68 (reversing when the defendant was not told the arrest warrant had already been issued). While the detectives spoke with Everett the day before they interviewed defendant, Everett's statements did not implicate defendant. Instead, Everett merely indicated defendant came over his house the day after the murder telling him something bad happened the night before concerning Aron and Kenny Mike. Instead, they merely indicated

13

defendant went to Everett's house the day after the murder and told Everett something bad happened the night before concerning Aron[2] and Kenny Mike. In fact, Everett suspected only Aron and Kenny Mike robbed Wiggins. As a result, the detectives interviewed defendant seeking information regarding defendant's whereabouts at the time of the murder and a buccal swab.

Defendant gave the detectives his alibi location, Farmingdale, but refused consent to a buccal swab. Defendant's interview answers and his refusal to provide a buccal swab resulted in a warrant for his arrest. Police telling defendant Aron had confessed, when he had not, to get a reaction or confession out of defendant is irrelevant to whether the police purposefully delayed filing the criminal complaint against defendant; it was also not prejudicial as the "bluff" was unsuccessful because defendant did not confess. Moreover, the police's tactic is not improper as defendant contends. See State v. Galloway, 133 N.J. 631, 655 (1993) ("The fact that the police lie to a suspect does not, by itself, render a confession involuntary."). Under the circumstances, the interview was necessary to gather enough evidence to get support for an arrest warrant and was not a circumvention of A.G.D.

---

[2] Because Aron and defendant have the same last name, we refer to Aron by his first name for convenience. We mean no disrespect.

III.

A.

In Point II, defendant argues the trial court abused its discretion in not suppressing the hearsay statements by Wiggins to Micheal Smith. Smith informed the police that Wiggins told him he received a phone call from a group of individuals—including Everett, Kenny Mike, Fitch, and Aron—after just seeing them on the street, wanting to buy marijuana. Wiggins previously sold marijuana to Aron and Kenny Mike. Cell phone records indicated the call was from Aron's phone.

At trial, Smith was permitted to testify:

> [Wiggins] was not per se asking my advice but maybe just talking out loud but he was kind of skeptical of the call. He was kind of unsure what to do concerning the call.
>      . . . .
>
> He had said the kids he ran into earlier he hadn't seen them in a while, and he wasn't sure whether just running into them and seeing them that day sparked their memory who he was or maybe they lost his phone number and found it again and contacted him, and they were looking to make a purchase [of marijuana].

Smith also stated that Wiggins expressed concern about the "different than usual" amount of marijuana ordered and about how "[t]he kid mentioned he didn't have a car" when Wiggins knew he drove a Honda Civic.

15

The trial court had ruled Smith's statements were admissible under N.J.R.E. 803(c)(3) to show a conspiracy to buy marijuana from Wiggins. The court reasoned:

> [I]n the statement . . . you have basically the plan of the decedent, who is actually involved – basically involved in a drug transaction, a crime, but this was his plan to sell, and he's showing that there are certain concerns he has and that he voices these concerns to . . . Smith, his friend who was riding in the car.
>
> So clearly it does involve an issue in the case. It's not just that it's an issue that is charged in the case in the indictment as was argued but it is clearly an issue as to the issue of conspiracy, those being involved, and the fact that, yes, there [were] conversations, and then . . . Wiggins indicates, yes, he is going to involve himself with a drug transaction even though he had certain concerns about it.
>
> But I would say in any drug transaction that goes down there are generally concerns about whether there is going to be a drug ripoff, things of that nature. I think that comes with the business of selling drugs.

## B.

Hearsay testimony based on the state-of-mind exception codified in N.J.R.E. 803(c)(3), provides in pertinent part: "A statement made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)."

16

Our Supreme Court has interpreted the rule to allow the admission of reliable hearsay evidence regarding proof of motive. In State v. Calleia, the Court held "when a victim's state-of-mind hearsay statements are relevant to show the declarant's own conduct, and when such conduct is known or probably known to the defendant, it also can give rise to motive, and the statements become admissible for that purpose, subject to the usual balancing under N.J.R.E. 403." 206 N.J. 274, 296 (2011). The statements become relevant "[w]hen a victim's projected conduct permits an inference that defendant may have been motivated by that conduct to act in the manner alleged by the prosecution, [at which time] the statement satisfies the threshold for relevance." Ibid. The Court recognized "'a wider range of evidence' is permitted to prove motive, so long as it remains a material issue in a case." Id. at 293-94 (quoting State v. Covell, 157 N.J. 554, 565 (1999)).

Significantly, the Court added:

> In light of its unique probative function, a strong showing of prejudice is necessary to exclude motive evidence under the balancing test of N.J.R.E. 403. See State v. Koskovich, 168 N.J. 448, 486 (2001); Covell, 157 N.J. at 570. Where the prosecution has a theory of motive that rests on circumstantial evidence, that evidence should not be excluded merely because it has some capacity to inflame a juror's sensibilities; to hold otherwise would preclude a jury from inferring a defendant's "secret design or purpose." See Rogers, 19

17

N.J. at 228. A reasonably broad allowance for motive evidence permits jurors, in their role as fact-finders and judges of credibility, to reject a given explanation for conduct as inconsistent with their understanding of human nature, or to accept a motive as a rational premise that could lead a defendant to criminality.

Time and again, courts have admitted motive evidence even when it did no more than raise an inference of why a defendant may have engaged in criminal conduct, and even in the face of a certain degree of potential prejudice stemming from the evidence.

[Id. at 294 (citations reformatted).]

## C.

Applying these legal principles, we conclude the trial court abused its discretion to allow Smith's testimony about Wiggins' statements concerning the phone call under N.J.R.E. 803(c)(3). See State v. Prall, 231 N.J. 567, 580 (2018) (recognizing an appellate court reviews "the trial court's evidentiary rulings . . . 'under the abuse of discretion standard'" (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010))). We agree with defendant that the court's admission of the statements — because they evinced a conspiracy to distribute drugs — was misplaced as neither defendant nor his co-defendants were charged with such conspiracy. In addition, Wiggins' statements are not probative of defendant's motive to rob Wiggins. The statements did not

18

reference defendant because Wiggins did not see defendant in the street with the other co-defendants prior to the phone call; Everett had not seen defendant that day; Smith did not know who called Wiggins; and there was no communication between defendant and Wiggins. The statements, which relayed Wiggins' own intent, emotions, and condition—his fearful, quizzical sense of the inquiry regarding the phone call—do not establish his apprehension that defendant or his co-defendants might rob him because they wanted to buy a large amount of marijuana. For the court to use the statements to show defendant's motive to rob Wiggins along with his co-defendants is a stretch, a conclusion with a flimsy foundation: There is no evidence in the record that Wiggins believed he would be robbed. If that was the case, we doubt he would have arranged the sale.

Although the court should not have admitted the statements, the court's error was harmless. See State v. Scott, 229 N.J. 469, 483-84 (2017) ("Rule 2:10-2 directs reviewing courts to disregard '[a]ny error or omission . . . unless it is of such a nature as to have been clearly capable of producing an unjust result.'" (alteration in original)). Putting aside the statements, the evidence against defendant was overwhelming: (1) his DNA was found in both the saliva and one of the masks in the parking lot of Mr. B's Golf Center adjacent to Wiggins' apartment; (2) his statements the next morning to Everett that "something bad

19

had happened"; (3) his cell phone pings never indicated his cell phone was in Farmingdale, thereby refuting his alibi; and (4) his cell phone pings indicated he communicated with co-defendants before the murder and they moved toward Wiggins' home prior to Wiggins' girlfriend calling the police. Hence, the admission of Wiggins' statements did not warrant a new trial because they were not, by themselves, clearly capable of resulting in defendant's guilty verdict. See R. 2:10-2.

IV.

In Point III, defendant asserts it is plain error that the trial court did not sua sponte instruct the jury on the N.J.S.A. 2C:11-3(a)(3) felony murder affirmative defense because defendant satisfied the necessary statutory criteria. The statute provides a four-prong affirmative defense to felony murder if the defendant: "(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; . . . (b) Was not armed with a deadly weapon . . . (c) Had no reasonable ground to believe that any other participant was armed with such a weapon . . . ; and (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury." N.J.S.A. 2C:11-3(a)(3). These prongs "focus on whether the accomplice undertook a homicidal

20

risk or could have foreseen that the commission of the felony might result in death." State v. Walker, 203 N.J. 73, 84 (2010) (quoting State v. Martin, 119 N.J. 2, 22-23 (1990)).

To establish the trial court's failure to charge a defense constituted plain error, a defendant must demonstrate the evidence clearly indicate the charge was appropriate. Id. at 87. The defendant has "the burden to produce some evidence in support of each prong of the defense, irrespective of whether there was strong evidence to the contrary." Id. at 87. "The trial court does not have the obligation on its own meticulously to sift through the entire record in every trial to see if some combination of facts and inferences might rationally sustain a[n unrequested] charge." State v. Rivera, 205 N.J. 472, 490 (2011) (alteration in original) (quoting State v. Thomas, 187 N.J. 119, 134 (2011)). Instead, the need for the charge must jump off the proverbial page. State v. Denofa, 187 N.J. 24, 42 (2006).

Defendant argues the trial evidence completely satisfied N.J.S.A. 2C:11-3(a)(3). First, there is no evidence defendant committed the homicidal act as Wiggins told his girlfriend Kenny Mike shot him, and the following day defendant told Everett "a shot . . . went off" when Kenny Mike and Wiggins were scuffling. Second, there is no evidence defendant had a gun. The gun was

21

found in Everett's yard when defendant was not there and taken by Fitch. Third, "no evidence was presented to establish at what point [d]efendant was included among those who would go to Wiggins' apartment" to rob him. As such, there was no proof defendant "had reason to believe" another participant in the robbery had a weapon. Fourth, defendant had no reason to know someone was going to use deadly force against Wiggins, as evinced by his statements to Everett the day after Wiggins was killed that something bad happened the night before. We are unpersuaded.

Although defendant's trial theory was that he was not at the crime scene, there was evidence to the contrary. Defendant's saliva was found near the crime scene, and Everett's testimony established that defendant was present at the crime scene when Wiggins was shot with the gun found in Everett's backyard. While there was evidence that Kenny Mike might have been the shooter, this only supported factors N.J.S.A. 2C:11-3(a)(3)(a) and (b). There was no evidence at all supporting factors N.J.S.A. 2C:11-3(a)(3)(c) and (d)—that defendant had no reasonable ground to believe Kenny Mike was armed with a weapon, and no reasonable ground to believe Kenny Mike intended to engage in conduct likely to result in Wiggins's death or serious physical injury.

Accordingly, the facts did not clearly indicate the appropriateness of charging the affirmative defense. Walker, 203 N.J. at 78.

## V.

### A.

In Point IV, defendant challenges his sentence, arguing it was excessive because it was disparate from the sentences imposed on Aron and Kenny Mike. Defendant was convicted of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree armed robbery, N.J.S.A. 2C:15-1; second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). The trial court found aggravating factor three, the risk of defendant committing another offense, N.J.S.A. 2C:44-1(a)(3), noting he was "picking up offenses" based on his 2007 disorderly conduct charge and 2008 possession of marijuana charge for which he was on probation at the time of the robbery. The court also found aggravating factor nine, the need to deter the defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9), due to the use of guns and defendant's marijuana use, which clouded his judgment. The court did not find any mitigating factors and, as such, the aggravating factors predominated.

Defendant was sentenced to fifty-years' imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Aron, who found the gun used to murder Wiggins, proposed robbing Wiggins, and was the get-away driver, was only convicted of second-degree conspiracy to commit armed robbery and second-degree robbery. He was sentenced to eight years. Kenny Mike, who defendant alleges shot Wiggins based on Wiggins' dying declaration, was sentenced to forty years subject to NERA. State v. Bacon-Vaughters, No. A-0583-11 (App. Div. Feb. 25, 2013) (slip op. at 1-2). He was eighteen years old at the time of the murder. Id. at 7.

## B.

We review a judge's sentencing decision under an abuse of discretion standard. State v. Fuentes, 217 N.J. 57, 70 (2014). We must determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

An appellate court should defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Natale, 184 N.J. 458, 489 (2005)).

Because the sentencing code's goal is uniformity, an "otherwise sound and lawful sentence" will be invalid if it is different from a similarly situated co-defendant's sentence. State v. Roach, (Roach I) 146 N.J. 208, 232-33 (1996). As the Court explained,

> the sentencing court must exercise a broader discretion to obviate excessive disparity. The trial court must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria. The court should then inquire into the basis of the sentences imposed on the other defendant. It should further consider the length, terms, and conditions of the sentence imposed on the co-defendant. If the co-defendant is sufficiently similar, the court must give the sentence imposed on the co-defendant substantive weight when sentencing the defendant in order to avoid excessive disparity. Sentencing based on such added considerations will accommodate the basic discretion of a sentencing court to impose a just sentence on the individual defendant in accordance with the sentencing guidelines while fulfilling the court's responsibility to achieve uniform sentencing when that is possible.

> [Id. at 233-34.]

"[A] sentence of one defendant not otherwise excessive is not erroneous merely because a co-defendant's sentence is lighter." Id. at 232 (quoting State v. Hicks, 54 N.J. 390, 391 (1969)). Differences in sentences among co-defendants requires resentencing where "there is an obvious sense of unfairness in having disparate punishments for equally culpable perpetrators." Ibid. (quoting State v. Hubbard, 176 N.J. Super. 174, 177 (Resentencing Panel 1980)). Because "some disparity in sentencing is inevitable," the issue "is whether the disparity is justifiable or unjustifiable." Id. at 233-34.

Our scope of review of alleged sentencing disparity is no different than when ordinary excessiveness of sentence is asserted, State v. Tango, 287 N.J. Super. 416, 422 (App. Div. 1996) (citing State v. Lee, 235 N.J. Super. 410, 414 (App. Div. 1989)), namely "whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review," State v. Ghertler, 114 N.J. 383, 388 (1989) (citing Roth, 95 N.J. at 365).

## C.

While defendant received a harsher sentence than Kenny Mike for the same offense, we perceive no sound basis to disturb the sentence based on disparity.

Defendant, Aron and Kenny Mike were tried separately before, and sentenced by, the same trial court. Aron, who was the driver of the getaway car, was only found guilty of second-degree offense. The court correctly determined that Aron's situation was not identical or substantially similar to defendant's situation. While Kenny Mike was found guilty of the same charges as defendant, he received a ten-year lighter sentence. The court found Kenny Mike's situation was not identical or substantially similar to defendant's situation for the following reasons:

> [I]n looking at who is who in this case, you have, [] Aron [], [Kenny Mike] sort of hatching this plan. . . . the gun was obtained [] at some point by [] Fitch. You have [Kenny Mike] is the one that goes to [Wiggins's apartment] . . . Goes up the stairs because [] [h]e's the one that knows [] Wiggins the best. [Kenny Mike] knocks on the door and he [] basically was going to be let into the apartment. [Kenny Mike] didn't have a mask on because they had to have the entrance. There was contact. There was cell phone messages, we're coming to buy the weed. That's how it happened.
>
> So we have a pretty good idea that it was [] not [Kenny Mike] that was the shooter. We have a good idea it wasn't [Aron] because he was the driver. The State's contention is that it was [defendant] that was the shooter. It could have been [defendant]. It could have been [] Fitch. Those are the two things that the [c]ourt, it's the [c]ourt's opinion as to [] who was involved.

27

Consequently, the court sentenced defendant to fifty years subject to NERA based on his greater level of participation in this case as the shooter. We are satisfied that the record presents an acceptable justification of defendant's sentence considering the sentence imposed on Kenny Mike. The court's factual finding that either defendant or Fitch was the shooter is entitled to deference. See Case, 220 N.J. at 65. Moreover, the court's factual finding is supported by Kenny Mike's statement indicating defendant was the shooter, which the sentencing court knew because it presided over Kenny Mike's trial as well. See Bacon-Vaughters, slip op. at 8-9. In all other respects, we conclude the court did not violate the sentencing guidelines and the record amply supports his findings on aggravating and mitigating factors. The sentence is clearly reasonable and does not shock our judicial conscience.

## VI.

In Points V and VI, defendant contends the prosecutor made improper summation statements which were unobjected to and not cured by the trial court, which caused unjust prejudice and an unfair trial. Defendant points to the prosecutor's statements:

- So[,] if there was any doubt about somebody golfing in this facemask, that night, . . . Do you cut [the] eyes and mouth out of a hat because you're cold? Why do you do this? To conceal

your identity? . . . Because you're going to commit a robbery and you want to get away with it. You don't want to be identified.

- It's the same reason why you park in a darkened back lot where your car cannot be seen from the windows . . . Your car can't be seen, hopefully your faces can't be seen. So that's why we have the mask.

- So[,] I don't know what the probabilities are because we heard a lot about it with DNA, right? We know the probabilities are incredible when it comes to the DNA on the mask. We know that. But what is the probability that [defendant] went golfing earlier that day, spat on the ground within [three] feet of the place where his brother went to park to go rob . . . Wiggins, and threw his mask on the ground? Impossible—that's ridiculous. Recognize it for what it is.

Defendant maintains the comments asked the jury to speculate beyond facts in the evidence, and the prosecutor effectively manipulated material evidence causing the "the jurors [to see it] . . . as proof of [his] guilt or participation in the crime."

The prosecutor's remarks were not "'clearly and unmistakably improper,' and [did not] substantially prejudice[] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Smith, 167 N.J. 158, 181-82 (2001) (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)). And

given the absence of an objection, defendant had to establish the remarks constituted plain error, State v. Feal, 194 N.J. 293, 312 (2008), meaning they were not "clearly capable of producing an unjust result," R. 2:10-2.

The prosecutor's references to Fitch's mask and the location of the parked car were intended to undermine defendant's argument that there were potentially legitimate reasons for him to wear his ski mask in Mr. B's Golf Center parking lot. Considering defendant's mask and saliva were discovered after the murder near Fitch's mask and the parked car—all in the vicinity of Wiggins' apartment—a reasonable inference is that defendant was not wearing his mask for legitimate reasons. The prosecutor was not insinuating Fitch's mask belonged to defendant or that defendant helped park the car in the darken lot. In summary, the prosecutor's statements were reasonably related to the evidence provided and defendant's argument is meritless. See State v. Frost, 158 N.J. 76, 82 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995)).

## VII.

In Point VII, defendant argues the trial court improperly erred in charging the jury with first-degree conspiracy to commit armed robbery when he was not indicted with the offense. Defendant maintains a higher-degree charge was prejudicial because it allowed the jury to compromise and convict him of the

lower degree of second-degree conspiracy to commit armed robbery. Defendant also claims if the jury was instructed properly, he would have been convicted of the lesser-included third-degree conspiracy to commit theft. Thus, he would have then been acquitted of the predicate armed robbery and, consequently, of felony murder.

Defendant's' arguments are meritless because they are based on a misreading of his indictment and trial record. The jury was never charged with first-degree conspiracy. The offense degrees on the verdict sheet correctly described the underlying armed robbery and robbery crimes, not the crime of conspiracy itself.

## VIII.

Lastly, in Point VIII, defendant argues the trial court erred in not sua sponte instructing the jury on the lesser-included offense of third-degree conspiracy to commit theft when there was a rational basis to do so. Defendant maintains there was no evidence establishing he possessed a gun or was aware that any of his co-defendants had a gun when the robbery of Wiggins was planned, which is necessary to convict him of second-degree conspiracy to commit armed robbery under N.J.S.A. 2C:15-l and N.J.S.A. 2C:5-5.

Defendant's argument is without merit. His trial counsel specifically requested the lesser-included offense of third-degree conspiracy to commit theft not be charged because the defense was that defendant was not present when co-defendants hatched the robbery plan. To charge the jury with the lesser-included offense of conspiracy to commit theft would have undermined the defense strategy. Moreover, the facts did not warrant a third-degree theft charge, considering a gun was used to kill Wiggins. See State v. Dunbrack, 245 N.J. 531, 549 (2021) ("[B]ecause counsel did not request the lesser included charge of theft, the applicable standard here is whether the lesser included offense of theft was clearly indicated from the facts presented at trial.").

To the extent any of defendant's arguments are not addressed, it is because we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32

A-1469-21