22CA0760 Peo v Zuniga 04-09-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0760
Jefferson County District Court No. 20CR3724
Honorable Randall C. Arp, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sonny Ray Zuniga,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE J. JONES
Lum and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 9, 2026

Philip J. Weiser, Attorney General, Grant R. Fevurly, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kamela Maktabi, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Sonny Ray Zuniga, appeals the district court's judgment of conviction entered on a jury verdict finding him guilty of sexual assault of a child by one in a position of trust (pattern of abuse) and aggravated incest. He also appeals the court's sexually violent predator (SVP) designation. We conclude that the court incorrectly designated Zuniga an SVP. We therefore vacate that portion of the sentence and remand for correction of the mittimus. In all other respects, we affirm.

## I.     Background

¶ 2     A.Z., the victim in this case, is Zuniga's daughter. A.Z. didn't have much contact with Zuniga during the first few years of her life because he was either incarcerated or living in a halfway house. But after his release, Zuniga fought for — and won — custody of A.Z. and her brother. A.Z., her brother, and her stepsister lived with Zuniga and A.Z.'s stepmother in a house in Lakewood, Colorado.

¶ 3     A.Z. later testified that, before Zuniga had full custody of her, he began sexually abusing her when she was five or six years old. Zuniga would call A.Z. into his bedroom in the Lakewood house and lock the door. Zuniga and A.Z. would then lie on the bed, and

Zuniga would pull down A.Z.'s pants and underwear.  He would then wet his fingers and touch A.Z.'s "private parts."  A few times, Zuniga made A.Z. touch his "private parts."  Zuniga told A.Z. not to tell anyone about the interactions.  These incidents stopped once A.Z. told Zuniga that she didn't want to go into the room with him.

¶ 4    A few years after the abuse ended, Zuniga left the Lakewood house.[1]  A.Z. and her siblings remained at the Lakewood house and were cared for by her stepmother.  But after her stepmother died in 2019, A.Z. went to live with her aunt — C.M. — and C.M.'s children, including C.M.'s stepdaughter, R.S.  Soon after moving in, A.Z. told R.S. that Zuniga had sexually assaulted her.  A.Z. told R.S. not to tell anybody.[2]

---

[1] Zuniga left because he was convicted in 2017 of sexual assault on a child by a person in a position of trust and subsequently incarcerated; A.Z.'s stepsister was the victim.  The jurors in this case didn't learn about this previous conviction, but they did learn that A.Z. participated in a 2017 forensic interview.  The interview related to the 2017 conviction.  During that interview, A.Z. said that Zuniga never touched her inappropriately.  However, A.Z. testified in this case that she lied during that interview because Zuniga had told her to.  We refer to this forensic interview as the "2017 forensic interview."

[2] It wasn't until 2021 that R.S. told the social services investigator that she knew about the assaults.

¶ 5    In 2020, A.Z. told C.M. at a backyard gathering that Zuniga had sexually assaulted her.  C.M. notified social services.  A.Z. then participated in a forensic interview in which she described Zuniga's sexual assaults in detail.[3]

¶ 6    Zuniga was charged with sexual assault on a child by one in a position of trust (pattern of abuse) and aggravated incest of A.Z.  A jury found Zuniga guilty as charged.  The district court sentenced Zuniga to eighteen years to life in the custody of the Department of Corrections.  The court also designated Zuniga an SVP.

## II.    Discussion

¶ 7    Zuniga contends that (1) the district court erred by admitting unreliable child hearsay; (2) the prosecutor committed misconduct by stating her personal opinion and denigrating the defense; (3) the district court erred by admitting irrelevant and prejudicial evidence of A.Z.'s behavioral disposition; and (4) the district court erred by

---

[3] We refer to this forensic interview as the "2020 forensic interview."

designating him an SVP.  We reject Zuniga's first three contentions but agree with his fourth.[4]

## A.    Child Hearsay

¶ 8    Zuniga first contends that the district court abused its discretion by admitting C.M.'s testimony about statements A.Z. had made to C.M. about the assaults because those statements were unreliable.  We disagree.

### 1.    Additional Background

¶ 9    At a pretrial hearing, C.M. testified about statements A.Z. made to her regarding Zuniga's sexual assaults.  C.M. said that after A.Z.'s stepmother died, A.Z. lived with C.M.  That's when C.M. noticed that A.Z. was displaying worrisome behavior, such as not leaving her room and always wearing baggy clothes.  C.M. initially thought this behavior was a result of A.Z. losing both her mother and stepmother.  But, because of Zuniga's previous sexual assault

---

[4] Zuniga's summary of the argument consists of nothing more than conclusory assertions of error: It doesn't contain clear statements of the arguments that articulate the major points of reasoning as to each issue, as required by C.A.R. 28(a)(6).  The People's summary is only marginally better.  We admonish the parties to comply with all provisions of C.A.R. 28 when filing briefs with this court.

conviction, she became concerned that Zuniga might have sexually assaulted A.Z.

¶ 10 C.M. and her sister decided to speak with A.Z. about her behavior and voice their concerns. C.M. told A.Z. they were going to C.M.'s sister's house to visit. A.Z. was unaware of the purpose of the visit.

¶ 11 When C.M. and A.Z. arrived at the house, A.Z. sat in the backyard with C.M., C.M.'s sister, and R.S. C.M.'s sister told A.Z. that she had been sexually assaulted as a child and had shown the same behavior that A.Z. was exhibiting. She asked A.Z. to tell them if anything had happened to her. A.Z. then said, "Yes," and began to cry. C.M.'s sister asked, "Who?" and A.Z. responded, "My uncle from my mom's side and my dad." The sisters asked A.Z. more questions about the assaults, including how often they had occurred and where they had occurred. C.M. also asked A.Z. if Zuniga had forced her to "put her mouth near [Zuniga's] privates?" and A.Z. nodded her head. C.M. testified that she asked this question because that was how Zuniga had assaulted A.Z.'s stepsister.

¶ 12    The prosecution sought to admit A.Z.'s statements to C.M. at trial under the child hearsay statute, section 13-25-129, C.R.S. 2025.  Following the hearing on the motion, at which C.M. gave the foregoing testimony, the court found that A.Z.'s general outcry to her aunts was admissible under the statute.  But the court also found that some of C.M.'s specific questions about the assaults were leading, and therefore those questions and A.Z.'s answers to them weren't admissible.

¶ 13    At trial, C.M. testified that A.Z. told her, her sister, and R.S. that her father had "touched" her "private parts" (or "down there") and had done so "often."  During the conversation, A.Z. was crying and had trouble getting the words out.

2.    Standard of Review and Applicable Law

¶ 14    We review a trial court's evidentiary decisions for an abuse of discretion.  *People v. Phillips*, 2012 COA 176, ¶ 63.  A court abuses its discretion when its decision "is manifestly arbitrary, unreasonable, unfair, or is based on a misunderstanding or misapplication of the law."  *People v. Thompson*, 2017 COA 56, ¶ 91.

¶ 15    "'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence

6

to prove the truth of the matter asserted."  CRE 801(c).  Hearsay is generally inadmissible at trial "except[, as relevant in this case,] as provided . . . by any statutes of the State of Colorado."  CRE 802. One such statute is the child hearsay statute, under which "[a]n out-of-court statement made by a child . . . that [is] the subject of the action, describing all or part of an offense of unlawful sexual behavior" is admissible even if it would otherwise be considered hearsay.  § 13-25-129(2).

¶ 16    But a child's hearsay statement can be admitted under the statute only if the district court finds after "a pretrial hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability."  § 13-25-129(5)(a).

¶ 17    In *People v. District Court*, 776 P.2d 1083 (Colo. 1989), the Colorado Supreme Court set forth eight factors that a court should consider when determining the reliability of a child's hearsay statement under the statute:

> (1) Whether the statement was made
> spontaneously;

7

(2) whether the statement was made while the child was still upset or in pain from the alleged abuse;

(3) whether the language of the statement was likely to have been used by a child the age of the declarant;

(4) whether the allegation was made in response to a leading question;

(5) whether either the child or the hearsay witness had any bias against the defendant or any motive for lying;

(6) whether any other event occurred between the time of the abuse and the time of the statement which could account for the contents of the statement;

(7) whether more than one person heard the statement; and

(8) the general character of the child.

*Id.* at 1089-90. The district court "should make specific findings on which factors establish reliability." *People v. Stackhouse*, 2012 COA 202, ¶ 22, *aff'd*, 2015 CO 48. However, "[w]hile these factors provide guidance and direction, the absence of one or more factor[s] does not bar a court from admitting a statement." *Thompson*, ¶ 145 (citing *Dist. Ct.*, 776 P.2d at 1090); *see also People v. Trujillo*, 923 P.2d 277, 282 (Colo. App. 1996) (The factors "should not be used to foreclose admissibility on the basis that a factor has not been

8

satisfied."). Thus, we will affirm a district court's decision to admit a child's hearsay statement "if the record shows an adequate factual basis to support the court's determination." *Stackhouse*, ¶ 22.

### 3. Analysis

¶ 18 At the pretrial hearing, the district court applied the factors set forth in *People v. District Court*, 776 P.2d at 1089-90. In considering those factors, the court found that A.Z.'s statements weren't spontaneous; she wasn't still in pain from the abuse that occurred years before; and C.M. and C.M.'s sister asked some leading questions regarding sexual assault, all of which weighed against the statements' admissibility. But the court also found that A.Z. didn't have any motive to lie about the assaults; many people heard the statements; the events in A.Z.'s life that occurred in between the assaults and the outcry didn't suggest that A.Z. would lie; and A.Z. was generally of good character, all of which favored the statements' admissibility. The court also didn't think that the child-appropriate-language factor was applicable, as there aren't "distinct difference[s] in language used by a 14 or 15-year-old versus that of an 18 or 19-year-old adult."

¶ 19    Zuniga argues that A.Z.'s statements to her aunts failed to satisfy the factors set forth in *People v. District Court*.  He recites several of the factors and argues why, he believes, A.Z.'s statements didn't meet them.  But, as previously mentioned, a statement doesn't need to satisfy each factor to be admissible.  *Trujillo*, 923 P.2d at 282.  So long as there is record support for the statement's reliability, we won't overturn the district court's ruling.

¶ 20    And in this case, there is record support for the district court's finding that A.Z.'s statements were reliable.  Though, as Zuniga argues, the backyard encounter was preplanned by A.Z.'s aunts, A.Z. didn't know about the plan.  And though her aunts asked A.Z. if she had been sexually assaulted, A.Z. identified her father and uncle as the perpetrators without prompting.

¶ 21    Zuniga also points to conflicts between statements from A.Z.'s 2017 and 2020 forensic interviews and suggests that these conflicts made her statements at the backyard gathering unreliable.  True, in her 2017 forensic interview, A.Z. told the interviewer that Zuniga had never touched her sexually.  But A.Z. later said that she had lied about Zuniga sexually assaulting her in her 2017 forensic interview because Zuniga had told her to lie and that she was

worried about getting in trouble at home if she told the truth. And her statements during the backyard gathering match those in her 2020 forensic interview, before which no one told her to lie.

¶ 22 Zuniga's argument that A.Z. was biased against him is merely speculative. There is no record support for the notion that A.Z. had a motive to lie in her statements to her aunts. In fact, A.Z. testified at trial that she still had good memories from when she lived with her father. And the court saw nothing suggesting that lying about the assaults would have benefited A.Z. in any way.[5]

¶ 23 Because there is record support for the district court's finding that A.Z.'s statements to C.M. were sufficiently reliable, the court didn't abuse its discretion by admitting them.

## B. Prosecutorial Misconduct

¶ 24 Zuniga contends that the prosecutor committed misconduct during rebuttal closing argument by expressing her personal belief that A.Z. and R.S. were truthful and by "mischaracterizing the

---

[5] It is also important to note that while the district court admitted some of A.Z.'s statements from the backyard gathering, it didn't admit all of them. The court didn't allow A.Z.'s answers to C.M.'s questions about Zuniga's specific sexual acts because it had determined they were made in response to leading questions.

defense theory as a groundless conspiracy theory." We disagree with both contentions.

### 1. Additional Background

¶ 25 During closing argument, Zuniga's attorney theorized that A.Z. had lied about the assaults in her 2020 forensic interview so that Zuniga wouldn't gain custody of A.Z.'s younger sister. Referencing the two forensic interviews, he asked the jury, "Do we believe the [A.Z.] of 2017? [Or] [d]o we believe the [A.Z.] of 2020 and here? They can't both be right."

¶ 26 In rebuttal closing, the prosecutor responded to defense counsel's question. She asked the jury,

> What set of events and what set of circumstances has to be true in order for the defendant to be not guilty? If it didn't actually happen, if this is all an extraordinarily elaborate, coordinated attempt to make this man guilty of something he actually didn't do, consider this, what does [A.Z.] have to do?

The prosecutor then argued that A.Z. would've had to "make up a very specific story." She also said that if A.Z. wanted to lie to prevent Zuniga from obtaining custody of A.Z.'s sister, she "could have told something way more aggravated than she actually did."

¶ 27  Defense counsel also theorized that R.S. also lied about Zuniga's sexual assaults. The prosecutor responded in her rebuttal closing that "if [R.S.] [wa]s actually in on this, like, let's hose Sonny Zuniga conspiracy theory, why [don't] [R.S.'s] imaginary details have more heft to them than they actually do."

¶ 28  Lastly, the prosecutor argued that if the assaults didn't happen, then A.Z. somehow knew exactly how to play the victim. She asked the jury to use common sense when deciding whether A.Z. created "quite literally the world's most malicious lie."

¶ 29  Zuniga's counsel didn't object to any of the prosecutor's statements.

### 2. Applicable Law and Standard of Review

¶ 30  A prosecutor has wide latitude when making arguments based on facts supported by evidence and reasonable inferences that may be drawn from those facts. *People v. Ray*, 2025 CO 42M, ¶ 129; *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010), *overruled on other grounds by*, *People v. Kennedy*, 2025 CO 63. But "a prosecutor, while free to strike hard blows, is not at liberty to strike foul ones." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005) (quoting *Wilson v. People*, 743 P.2d 415, 418 (Colo. 1987)).

¶ 31    We use a two-step analysis to review claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we look at whether the statement "was improper based on the totality of the circumstances." *Id.* Second, if a statement was improper, we determine whether it warrants reversal under the proper standard of review. *Id.* In this case, because defense counsel didn't object to any of the statements, that standard is plain error. *Id.* at 1097. We reverse under plain error review only if the error was obvious and so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 32    When determining whether a statement was improper, we must evaluate the statement "in the context of the argument as a whole and in light of the evidence before the jury." *Ray*, ¶ 128 (quoting *Strock*, 252 P.3d at 1153).

¶ 33    A prosecutor can't "communicate her opinion on the truth or falsity of witness testimony during final argument." *Domingo-Gomez*, 125 P.3d at 1049. But a prosecutor "can argue to the jury that they should not believe a witness." *Id.* at 1050 (quoting *State v. Locklear*, 241 S.E.2d 65, 70 (N.C. 1978)); *see also People v.*

14

*Herold*, 2024 COA 53, ¶¶ 86-89 (the prosecutor didn't give a personal opinion when commenting on evidence that cast doubt on a witness's version of events).

¶ 34     "A prosecutor may not state or imply that defense counsel has presented the defendant's case in bad faith or otherwise make remarks for the purpose of denigrating defense counsel." *People v. Iversen*, 2013 COA 40, ¶ 37.  But "a prosecutor has considerable latitude in replying to opposing counsel's argument." *Id.*  This includes "comment[ing] on the lack of evidence confirming [a] defendant's theory of the case." *People v. Duncan*, 2023 COA 122, ¶ 32 (quoting *People v. Medina*, 545 P.2d 702, 703 (Colo. 1976)).

### 3.     Analysis

¶ 35     First, Zuniga argues that the prosecutor expressed her personal opinion that A.Z. and R.S. were telling the truth.  Not so.  Considering the statements in context, the prosecutor was responding to defense counsel's closing argument.  Defense counsel had emphasized that there were differences between A.Z.'s statements during the 2017 and 2020 forensic interviews and suggested (at least) that A.Z. lied in her 2020 interview.  The prosecutor then used her rebuttal closing to respond to that

15

argument and point out the weaknesses of Zuniga's theory of defense. *See People v. Conyac*, 2014 COA 8M, ¶¶ 137-139 (the prosecutor's comment that the victim must be "a fantastic liar" wasn't misconduct because the comment was a response to the defense's closing argument). And these comments were expressly based on evidence that had been presented to the jury.

¶ 36  Second, Zuniga argues that the prosecutor denigrated the defense when she said, "[T]his, like, let's hose Sonny Zuniga conspiracy theory." While the propriety of this comment is a closer call, we conclude that it doesn't constitute misconduct. In the context of the rebuttal closing, the comment referred to the defense's speculation that A.Z. fabricated the assault allegations so that Zuniga couldn't obtain custody of A.Z.'s younger sister. The prosecutor was simply poking holes in the defense's theory of the case, using a colorful phrase to point out the lack of evidence supporting it. *See People v. Rodriguez*, 2021 COA 38M, ¶ 31 ("[A] prosecutor 'may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance.'" (quoting *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003))).

## C. Victim Impact Statement

¶ 37 Zuniga contends that the district court incorrectly admitted irrelevant and prejudicial victim impact evidence of A.Z.'s changed behavior after disclosing Zuniga's sexual abuse to family members. We disagree.

### 1. Additional Background

¶ 38 At trial, C.M. testified that she had seen positive changes in A.Z.'s demeanor after A.Z. told her about the assaults. The following exchange occurred between the prosecutor and C.M.:

> [Prosecutor:] Since you and your family have started to find out what transpired between [A.Z.] and her father, has she changed at all?
>
> [C.M.:] Yes.
>
> [Prosecutor:] What do you mean by that?
>
> [C.M.:] She's a completely different little girl. She's outspoken. She talks. She dresses like a normal teenager. She does normal teenage things. She does really well in school. She has more friends now.
>
> [Prosecutor:] Okay.
>
> [C.M.:] She's happy.

Zuniga's counsel didn't object.

## 2. Standard of Review and Applicable Law

¶ 39  "Trial courts have broad discretion in determining the admissibility of evidence based on its relevance, its probative value, and its prejudicial impact." *People v. Elmarr*, 2015 CO 53, ¶ 20. A court abuses that discretion when "its ruling is 'manifestly arbitrary, unreasonable, or unfair,'" or when "it is based on an erroneous view of the law." *Id.* (quoting *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002)). We review unpreserved claims of evidentiary error for plain error, *People v. Snelling*, 2022 COA 116M, ¶ 33, and we will reverse only if the error was obvious and so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction, *Hagos*, ¶ 14.

¶ 40  All relevant evidence is presumptively admissible, except as otherwise provided by constitution, rule, or statute. CRE 402. Evidence is relevant when it makes a fact of consequence more or less likely than it would be without it. CRE 401. "In criminal cases, evidence is relevant if the evidence makes it more or less probable that a criminal act occurred, the defendant was the perpetrator, or the defendant acted with the necessary criminal

intent." *People v. Mena*, 2025 COA 14, ¶ 15 (quoting *People v. Clark*, 2015 COA 44, ¶ 17).

¶ 41　　Nonetheless, even relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. CRE 403. Evidence is considered unfairly prejudicial if it suggests a decision based on an improper basis, such as "sympathy, hatred, contempt, retribution, or horror." *People v. Valdez*, 2017 COA 41, ¶ 37 (quoting *People v. Dist. Ct.*, 785 P.2d 141, 147 (Colo. 1990)).

¶ 42　　"Victim impact evidence is evidence that relates to 'the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family.'" *People v. Martinez*, 2020 COA 141, ¶ 29 (quoting *Schreibvogel v. State*, 2010 WY 45, ¶ 22). Whether victim impact evidence is admissible at trial depends on "whether the evidence is relevant to determining whether the defendant committed the crime for which he or she was charged." *Id.* at ¶ 33; *accord Mena*, ¶ 15. Victim impact evidence is admissible during the guilt/innocence phase of a trial if it "tends to show the context or circumstances of the crime itself." *Martinez*,

¶ 34 (quoting *State v. Graham*, 650 S.E.2d 639, 646 (N.C. Ct. App. 2007)).

### 3. Analysis

¶ 43 Zuniga argues that evidence regarding A.Z.'s demeanor after she disclosed the assaults was irrelevant to whether he committed the offense. This testimony, he says, was effectively a victim impact statement, and nothing in the testimony described the context or circumstances of the alleged crime.

¶ 44 It is doubtful that C.M.'s testimony about A.Z.'s change in demeanor constituted victim impact evidence. Victim impact evidence is evidence of "the *effect of a crime* on a [victim or the] victim's family." *Id.* at ¶ 33 (emphasis added) (quoting *Graham*, 650 S.E.2d at 645). But C.M. was testifying to the impact that telling others about the abuse had on A.Z., not the impact of the abuse itself. The People also correctly point out that the testimony was relevant to A.Z.'s credibility, a central issue in this case. The statement was therefore relevant. And the statement's probative value wasn't substantially outweighed by the danger of unfair prejudice. *See Mena*, ¶ 27 ("Any unfair prejudice from the jury

sympathizing with [the victim] was not likely to substantially outweigh this relevance.").

¶ 45 But even if the court erred by admitting this testimony, the error wasn't plain. Given that the testimony didn't describe A.Z.'s change in behavior caused by the crime, the possible error wasn't obvious.

¶ 46 Nor does any error cast serious doubt on the reliability of the jury's verdict. The testimony was brief and the admissible evidence of Zuniga's guilt was, while not overwhelming, relatively strong. *See People v. McMinn*, 2013 COA 94, ¶ 70 (the prosecutor's improper comments didn't constitute plain error because "the evidence supporting [the defendant's] conviction was strong").

### D. Cumulative Error

¶ 47 We reject Zuniga's cumulative error argument. Because there was, at most, one error, the cumulative error doctrine doesn't apply. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24; *People v. Jones*, 2025 COA 43, ¶ 56 (*cert. granted on other grounds* Jan. 20, 2026); *People v. Thames*, 2019 COA 124, ¶ 69.

## E.     SVP Designation

¶ 48     Zuniga contends that the district court incorrectly designated him an SVP because there was no evidence that he promoted a relationship with A.Z. for the purpose of sexually victimizing her. We agree and vacate the designation.

### 1.     Additional Background

¶ 49     At Zuniga's sentencing hearing, the district court determined whether to designate Zuniga an SVP.  The prosecutor argued that Zuniga promoted a relationship with A.Z. for the purpose of sexually assaulting her because the two had no relationship before the assaults.  She also asserted that the abuse started as soon as Zuniga completed his sentence for a previous conviction.  Zuniga's counsel objected to the designation.  The court agreed with the prosecutor and found that Zuniga met the criteria for an SVP designation.

### 2.     Standard of Review and Applicable Law

¶ 50     A district court's SVP designation presents a mixed question of fact and law.  *Allen v. People*, 2013 CO 44, ¶ 4.  We defer to the court's factual findings if they have record support, and we review the court's legal conclusions de novo.  *Id.*  Where "the statutory

language is clear, we apply the plain and ordinary meaning of the provision." *People v. Gallegos*, 2013 CO 45, ¶ 7 (quoting *Lobato v. Indus. Claim Appeals Off.*, 105 P.3d 220, 223 (Colo. 2005)).[6]

¶ 51 Under section 18-3-414.5, C.R.S. 2025, the court may designate a defendant an SVP if (1) the defendant was tried as an adult; (2) the defendant was convicted of certain sex assault crimes, including sexual assault on a child by one in a position of trust; (3) the victim was "a person with whom the offender established or promoted a relationship primarily for the purpose of sexual victimization"; and (4) the defendant is found, based on the result of a screening test, to be likely to commit a subsequent sexual offense. § 18-3-414.5(1)(a)(I)-(IV). "[A]n SVP designation [must] be based on 'reliable evidence, not speculation or unfounded allegations.'"

---

[6] The People argue that Zuniga didn't preserve this issue for appeal because, while his attorney made a general objection to the designation, "he did not make any further argument and did not challenge or specifically object to the promoting a relationship finding." However, an issue is preserved for appeal if the trial court was presented with an opportunity to make findings of fact and conclusions of law on the issue. *People v. Springsted,* 2016 COA 188, ¶ 10 (citing *People v. Melendez,* 102 P.3d 315, 322 (Colo. 2004)). Zuniga's counsel objected to the designation at the sentencing hearing, and the court made findings of fact and conclusions of law. Thus, the issue is preserved.

*People v. Lopez*, 2020 COA 41, ¶ 8 (quoting *People v. Tuffo*, 209 P.3d 1226, 1231 (Colo. App. 2009)).

¶ 52    For the purpose of the statute, an offender promotes a relationship if, "excluding the offender's behavior during the commission of the sexual assault that led to his conviction, he otherwise encouraged a person with whom he had a limited relationship to enter into a broader relationship primarily for the purpose of sexual victimization." *Gallegos*, ¶ 14.  Behavior in preparation of the assault isn't considered when making this designation, as it doesn't "encourage the victim 'to enter into a broader relationship primarily for the purpose of sexual victimization.'" *People v. Tunis*, 2013 COA 161, ¶¶ 39-40 (quoting *Gallegos*, ¶ 14).

### 3.    Analysis

¶ 53    Zuniga only challenges the district court's finding that he promoted a relationship with A.Z. for the purpose of sexual victimization, so we limit our analysis to that requirement.  *See People v. Ehlebracht*, 2020 COA 132, ¶ 28.  The People make three arguments that Zuniga promoted a relationship with A.Z.  We reject each in turn.

24

¶ 54    First, the People argue that Zuniga promoted his relationship with A.Z. because the frequency of sexual assaults increased with the amount of time Zuniga spent with A.Z.  They argue that this shows that Zuniga's main purpose in fostering the relationship was for sexual victimization.  But before Zuniga began sexually assaulting A.Z., he was incarcerated or in a halfway house, and he immediately began assaulting A.Z. when he was released and sought custody.  As the prosecutor said at sentencing, Zuniga "essentially went zero to sixty as far as subjecting [A.Z. and her stepsister] to sexual abuse."  This evidence doesn't show that Zuniga encouraged or enlarged the scope of his relationship with A.Z. for the primary purpose of sexual victimization: There was virtually no relationship before the assaults, and, as noted above, the assaults themselves can't constitute promotion.  *See People v. Tixier*, 207 P.3d 844, 847 (Colo. App. 2008) (defining the word "promote" as "'to encourage' and 'to enlarge'" (quoting Webster's Third New International Dictionary 1815 (1986))).

¶ 55    Second, the People argue that Zuniga promoted a relationship with A.Z. by creating situations where he would assault her, such as "calling her into his room under various pretenses and locking

25

the door to ensure privacy from others."  But Zuniga took these actions to prepare to sexually assault A.Z.  Because these actions occurred during the commission of the sexual assaults that led to Zuniga's conviction, they can't be considered.  *See Gallegos*, ¶ 14; *see also People v. Valencia*, 257 P.3d 1203, 1205, 1207-08 (Colo. App. 2011) (the defendant's actions of hiding in victim's closet and attacking her before sexually assaulting her didn't promote a relationship for the purpose of sexual victimization); *cf. People v. Brosh*, 251 P.3d 456, 461 (Colo. App. 2010) (the defendant promoted a relationship with victim by "inviting the victim over to his house . . . on several occasions . . . [and] request[ing] that the victim have [a] sleep over at his residence").[7]

¶ 56      Third, the People argue that Zuniga engaged in other behavior that fostered his relationship with A.Z., such as "sharing his hobby [of removing pieces of gold from computer memory boards] with

---

[7] The People argue that "behavior during the commission of the offense" only relates to the actual touching of the victim.  However, Colorado case law holds that actions taken by the defendant in preparation of the assault don't promote a relationship.  *See Uribe-Sanchez v. People*, 2013 CO 46, ¶ 10; *People v. Valencia*, 257 P.3d 1203, 1205, 1207-08 (Colo. App. 2011); *People v. Tunis*, 2013 COA 161, ¶ 40.

her." But A.Z. said in her 2020 forensic interview that Zuniga began sexually assaulting her before he started sharing his hobby with her.

¶ 57 In sum, under the controlling test, which we must, of course, apply, there was no evidence that Zuniga promoted a relationship with A.Z. for the primary purpose of sexual victimization. It follows that the SVP designation must be vacated.

### III. Disposition

¶ 58 We affirm the judgment. We vacate the SVP designation and remand for correction of the mittimus.

JUDGE LUM and JUDGE MEIRINK concur.